1  GregoryB. Collins (#023158)
   Eric B. Hull (#023934)
2  KERCSMAR & FELTUS PLLC
   6263 North Scottsdale Road, Suite 320
3  Scottsdale, Arizona 85250
   Telephone: (480) 421-1001
4  Facsimile: (480) 421-1002
   gbc@kflawaz.com
5  ebh@kflawaz.com

6  Attorneys for Plaintiffs Ron Kramer, Sal Abraham, and
   ThermoLife International LLC
7

8                    UNITED STATES DISTRICT COURT

9                    FOR THE DISTRICT OF ARIZONA

10 Ron Kramer, an Arizona resident; Sal
   Abraham, a Florida resident; ThermoLife    Case No.  2:11-cv-01965-PHX-JAT  (Lead)
11 International LLC, an Arizona limited li-              2:11-cv-02033-PHX-JAT (Cons)
   ability company,
12
                    Plaintiffs,
13
                                              **PLAINTIFFS' STATEMENT OF**
14 v.                                         **FACTS IN SUPPORT OF THEIR MO-**
                                              **TION FOR SUMMARY JUDGMENT**
15 Creative  Compounds  LLC,  a  Nevada       **ON DEFENDANT'S DECLARATORY**
   limited liability company,                 **JUDGMENT COMPLAINT AND**
16                                            **PLAINTIFFS' CLAIM FOR PATENT**
                    Defendant.                **INFRINGEMENT**
17 ─────────────────────────────────
18 Creative  Compounds  LLC,  a  Nevada
   limited liability company,
19
                    Plaintiff,
20
   v.
21
   Ron Kramer, an Arizona resident; and
22 Sal Abraham, a Florida resident,

23                  Defendants.

24       1.      Ron Kramer founded ThermoLife in 1998.  (R. Kramer Dep. (10/25/2012),

25 attached as Exhibit 1, at 22:15-20.)

26       2.      Prior to founding ThermoLife, Kramer was a gym owner who had competed

27 in bodybuilding  and  later  promoted  professional  bodybuilding  competitions  for  the

28

                                    1

International Federation of Bodybuilders. Between 1994 and 1997, Kramer opened and operated a Gold's Gym in Santa Cruz, California. (Exhibit 1 at 22:20-23:15.)

3.    During his time as a bodybuilder, promoter, and gym owner, Kramer discovered that many dietary supplements failed to meet any quality control standards. Often supplements were spiked with hidden ingredients and labeled incorrectly. Many were ineffective. At the time ThermoLife was established, few supplements were clinically researched or field tested. Even today, relatively few supplements have been proven to work as advertised. (*Id*. at 23:1-15.)

4.    In 1998, Kramer founded ThermoLife in order to provide the public with quality proven supplements. ThermoLife is committed to selling only the purest, most effective and innovative products. (*Id*.)

5.    On October 20, 2004, Ron Kramer and Sal Abraham submitted an application for a United States Patent related to the use of diiodothyroacetic acid in dietary supplements. (U.S. Patent No. 7,919,533 B2, attached as Exhibit 2.)

6.    On April 5, 2011, the '533 Patent was duly and legally issued to inventors Sal Abraham and Ron Kramer.  (*Id*.)

7.    The '533 Patent claims "a method of promoting lean body mass in human individuals having a body mass index of at least 25, comprising directly administering to the individual an effective amount of diiodothyroacetic acid." (*Id*. at Claim 1.)

8.    The '533 Patent also claims, "A dietary supplement comprising diiodothyroacetic acid." (*Id*. at Claim 11.)

11.    On September 22, 2011, Creative Compounds, LLC ("Creative") sent out a targeted email marketing diiodothyroacetic acid ("DIAC") for use in dietary supplements to 11 potential customers. (CREA005-22, attached as Exhibit 3.)

12.    Creative's September 22, 2011 email stated:

> Creative Compounds is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies

2

surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic [sic] acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

(*Id*.) The email also included a sales sheet offering to sell DIACtive for use as a dietary supplement.  (*Id*.)

13.    The purpose of the email "was to have one of these companies buy DIACtive and use it in a dietary supplement . . . ." (C. McNeely Dep, (2/12/13), attached as Exhibit 4, at 44:5-16.)  McNeely testified that DIAC "is something we definitely want to sell." (*Id*. at 38:11-39:4.)

14.    Plaintiff's expert determined, "Within an absolute degree of certainty Creative Compounds advertising and promotional materials claim that the DIACtive product contains DIAC which is diiodothyroacetic acid." (Expert Report of John A. Bundy, PhD, CMI, attached as Exhibit 5, at p.3.)

15.    The basis of Creative's defense is an order for DIAC that Creative's consultant, Derek Cornelius, placed with Francisco Tabak, a supplier in Argentina. (Defendant's Response to Plaintiff's First Set of Interrogatories, attached as Exhibit 6, at p. 3; D. Cornelius Dep. (2/7/13), attached as Exhibit 7 at 46:5-19.)

16.    Creative's President Corey McNeely testified that he did not know of any facts to support this claim and that he had "delegated authority with respect to the company's handling of this litigation" to Derek Cornelius. (Exhibit 4 at 54:6-9; *see also id*. at 51:8-52:7.)

17.    When Cornelius obtained the sample of DIAC, he engaged in limited experimentation. "[The] first thing [he] did was test it on [him]self . . . for . . . like, four to six weeks . . . ." (Exhibit 7 at 51:1-52:1.)

18.    During this time, Cornelius checked his pulse, blood pressure, and weight twice a day. (*Id*. at 56:12-16; 59:7-10.)

19.    Cornelius does not remember the dosage he used and did not keep a journal of the testing. (*Id*. at 52:14-53:3.)

20.    Conelius cannot remember the effect of the DIAC on his blood pressure or weight loss – "I don't remember the exact, but it wasn't -- I didn't lose ten pounds.  I remember losing a few, so." (*Id*. at 60:21-61:15.) Cornelius did not make any effort to determine of his weight loss was due to DIAC or other factors. (*Id*. at 74:13-17.)

21.    After Cornelius tested the sample on himself, he "tested it on about four or five [other] people . . . ." (*Id*. at 65:22-66:9.)   In this second group, Cornelius again looked at "blood pressure, heart rate, just to make sure in other people it was okay and then ultimately, you know, make sure it was fat loss that they were getting." (*Id*. at 67:8-19.)  Cornelius did not keep any journals of the tests on this second group. (*Id*. at 53:4-17; 68:10-14.)

22.    Cornelius described his testing results as "anecdotal." (*Id*. at 68:1-5; 74:3-4.) He concedes that he does not remember the results of the testing other than that he "think[s] people lost a small amount of weight and felt pretty good on it." (*Id*. at 71:15-72:13.)

23.    Cornelius made no efforts to determine whether the weight loss was attributable to the DIAC or other factors—instead the results were "subjective." (*Id*. at 72:17-73:18; 74:1-2.)

24.    Cornelius never published the results of his tests. (*Id*. at 75:14-16.)   He believes he may have discussed the tests on a message board but "[n]one of that information would've been kept.  That website is -- no parts of that website are around anymore as far as I know." (*Id*. at 75:17-76:12; 78:1-5.)

25.    Cornelius never called an attorney regarding the possibility of obtaining a patent.  (*Id*. at 83:9-14.)

26.    Cornelius never commissioned a study of DIAC—all of his testing was "anecdotal." (*Id*. at 119:14-18.)

27.     Cornelius' testing only pertained to Claims 11-13 in the '533 Patent. He concedes that he never determined "whether or not administering DIAC to an individual having a body mass index of at least 25 promoted lean body mass . . . ." (*Id*. at 89:18-90:4; 90:12-18.)

28.     Cornelius never conducted any research into the areas covered in Claims 1-10 of the '533 Patent.  Instead, Cornelius believed that "I felt like [DIAC] meets the criteria of a dietary supplement." (*Id*. at 93:3-17.)

29.     In an effort to clarify Creative's claims, ThermoLife issued an Interrogatory requesting that Creative "[i]dentify each and every factual and/or legal contention that supports your contention that the '533 Patent is invalid."  (Exhibit 6 at p. 3.)  Creative responded in full:

> Without waiving any of the foregoing objections, Derek Cornelius conceived of diiodothyroacetic acid ("DIAC") as a nutritional supplement, and further as nutritional supplement to promote lean body mass, in the fall of 2000. Mr. Cornelius thereafter communicated with Francisco Tabak and Tolbiac SRL about the manufacture and supply of DIAC, with such discussions occurring in and through late fall and early winter of 2000-2001. By approximately the end of February 2001, Mr. Cornelius had received from Francisco Tabak an approximately 5 to 10 gram sample of DIAC. Among others, Mr. Cornelius took doses of DIAC orally as a dietary supplement to test its efficacy to promote lean body mass.

(*Id*.)

30.     Because Creative's President has stated under oath at deposition that Creative never sold any of the DIAC it advertised for sale, Plaintiffs do not seek monetary damages here.  (Third Supplemental Disclosure, attached as Exhibit 8.)

RESPECTFULLY SUBMITTED this 11th day of March, 2013.

KERCSMAR & FELTUS PLLC

By *s/ Gregory B. Collins*
Gregory B. Collins
Eric B. Hull
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
*Attorneys for Plaintiffs Ron Kramer, Sal Abraham,*
*and ThermoLife International LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          I certify that on March 11, 2013, I electronically transmitted the foregoing to
the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice
4     of Electronic Filing to the following.

5     THOMAS DEGROOT, LLC
      Thomas DeGroot
6     7733 Forsyth Blvd., Suite 1100
      St. Louis, MO 63105
7     *Attorney for Defendant*
      *Creative Compounds, LLC*
8

9     Maria Crimi Speth

      Adam S. Kunz
10    JABURG & WILK, P.C.

11    3200 N. Central Avenue, Suite 2000

      Phoenix, Arizona 85012
12    mcs@jaburgwilk.com

13    ask@jaburgwilk.com
      *Attorneys for Defendant Creative Compounds, LLC*
14

15     *s/Gregory B. Collins*

16

17

18

19

20

21

22

23

24

25

26

27

28