UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 1 – R. Kramer Deposition taken on 10/25/2012

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3

4    Ron Kramer, an Arizona resident; )
     Sal Abraham, a Florida resident; )
5    ThermoLife International LLC, an )
     Arizona limited liability        )
6    company,                         )
                                      )
7              Plaintiffs,            )
                                      )  No.
8         vs.                         )  2:11-cv-1965-PHX-JAT
                                      )  (Lead)
9    Creative Compounds LLC, a Nevada )  2:11-cv-2033-PHX-JAT
     limited liability company,       )  (Cons)
10                                     )
               Defendant.             )
11   _____)
                                      )
12   Creative Compounds LLC, a Nevada )
     limited liability company,       )
13                                     )
               Plaintiff,             )
14                                     )
          vs.                         )
15                                     )
     Ron Kramer, an Arizona resident; )
16   Sal Abraham, a Florida resident; )
     ThermoLife International LLC, an )
17   Arizona limited liability        )
     company,                         )
18                                     )
               Defendants.            )
19   _____)

20              C O N F I D E N T I A L

21         VIDEOTAPED DEPOSITION OF RON KRAMER, taken on

22   behalf of the Defendant, at 801 South Figueroa Street,

23   19th Floor, Los Angeles, California, commencing at

24   9:14 a.m., Thursday, October 25, 2012, before

25   ZINA TALLANT, Certified Shorthand Reporter No. 13341.

                              2

BARKLEY
Court Reporters

09:36  1    BY MR. DEGROOT:

       2        Q    Yeah.  You do agree that there's a difference

       3    between weight loss and promotion of lean muscle mass in

       4    humans, isn't there?

09:36  5        A    Yes.

       6        Q    And fat is often referred to as adipose tissue,

       7    right?

       8        A    Yes.

       9        Q    And one can lose adipose tissue or fat as a

09:36 10    means of losing weight and that is different than

      11    shifting the proportion between lean body mass and fat,

      12    right?

      13        A    Yes.

      14        Q    Can you turn to page 4 of the complaint?

09:36 15        A    Is that Exhibit 1?

      16        Q    Yes.  Paragraph 18 talks about you founding

      17    ThermoLife in 1998, correct?

      18        A    Yup.

      19        Q    Would that be ThermoLife International?

09:37 20        A    Yup.

      21        Q    It also says that you were a gym owner.  Would

      22    that be the Gold's Gym?

      23        A    That's what it says there, doesn't it?

      24        Q    Well, the next paragraph says between '94 and

09:37 25    '97 you opened and operated a Gold's Gym.

                                    22

BARKLEY
Court Reporters

09:37 1           Is that the same gym that is being referred to

2    in paragraph 18?

3       A    Yes.

4       Q    All right.  And then in paragraph 20 you talk

09:37 5    about you're discovering that many dietary supplements

6    failed to meet any quality control standards, had hidden

7    ingredients, and were labeled incorrectly, right?

8       A    That's correct.

9       Q    And then you founded ThermoLife in order to

09:37 10   provide the public with quality proven supplements.  And

11   paragraph 23 is that you wanted to disclose the

12   supplements in a full way to consumers, correct?

13      A    Uh-huh.

14      Q    Is that correct?

09:38 15      A    That's what it says.

16      Q    Okay.  And so it was your goal in the late '90s

17   to open and run a business that was honest and ethical

18   and told consumers what they needed to know, correct?

19      A    Sure.

09:38 20       MR. COLLINS:  Object to the form.

21        THE WITNESS:  Yes.

22   BY MR. DEGROOT:

23      Q    All right.  Now, in the 1990s, did you consider

24   yourself to be leading a life in an honest and ethical

09:38 25   manner?

23

BARKLEY
Court Reporters

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 2 – U.S. Patent No. 7,919,533 B2

US007919533B2

(12) **United States Patent**
Abraham et al.

(10) Patent No.: **US 7,919,533 B2**
(45) Date of Patent: **Apr. 5, 2011**

(54) **DIIODOTHYROACETIC ACID AND METHOD OF USE**

(76) Inventors: **Sal Abraham**, Watchung, NJ (US); **Ron Kramer**, Phoenix, AZ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1020 days.

(21) Appl. No.: **10/904,029**

(22) Filed: **Oct. 20, 2004**

(65) **Prior Publication Data**
US 2006/0083779 A1      Apr. 20, 2006

(51) Int. Cl.
*A61K 31/195*      (2006.01)

(52) U.S. Cl. .......................................... 514/909; 514/567

(58) Field of Classification Search .................. 424/434
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,198,702 | A | * | 8/1965 | Hellbaum ..................... 514/570 |
| 4,490,221 | A | * | 12/1984 | Collange et al. ............. 205/435 |
| 4,672,691 | A | * | 6/1987 | De Garie et al. .............. 4/499 |
| 4,673,691 | A | * | 6/1987 | Bachynsky .................... 514/567 |
| 5,910,569 | A | | 6/1999 | Latham et al. |
| 6,380,255 | B1 | | 4/2002 | Latham et al. |

OTHER PUBLICATIONS

Pittman et al., "Effect of thyroxine analogs on the peripheral metabolism of thyroxine: the half-life and pattern of elimination." Endocrinology (1964), 74 (4), 611-6 (CAPLUS abstract).*
Benedetti, A. "Influence of some thyroxine derivatives on the glycoactive adrenal secretion." Folia Endocrinologica (1961), 14, 253-9 (CAPLUS abstract).*
Benedditi, A. "Influence of some thyroxine derivatives on the glycoactive adrenal secretion" Folia Endocrinolgica (1961), 14, 253-9 (CAPLUS abstract).*
Pittman, C.S. et al. "Effect of thyroxine analog on the peripheral metabolism of thyoxine: the half life and pattern of elimination" Endocrinology (1964), 74 (4), 611-6.*
Rutgers, et al. Indentification of 3,3,5-diiodothyroacetic acid sulfate: A major metabolite of 3,3,5-triiodothyronine in propylthiouracil treated rats, 1990, Endocrinology, vol. 124. p. 1617-1624.*
Benedetti, A. Influence of some thyroxine derivatives on the glycoactive adrenal secretion (abstract).*

Pittman, et al. Effects of thyroxine analogs on the peripheral metabolism of thyroxine: the half life and pattern of elimination (abstract).*
Rutgers et al. Endocrinology.*
Pittman et al. Endocrinology.*
Rutgers, et al. Identification of 3,3'-diiodothyroacetic acid sulfate: A major metabolite of 3,3'5-triiodothyronine in propylthiouracil treated rats, Endocrinology, vol. 127, No. 4, 1990.*
Marja Rutgers, "Identification of 3,3'-Diiodothyroacetic acid sulfate:A major metabolite of 3,3',5-triiodothyronine in Propylthiouracil-treated rats" Endocrinology 1990;p. 1617.
I Várnai, M Farkas: Acta Physiol Hung. Acad. Sci. Hung. 1959; 15: 151-60.
I Várnai, M Farkas, SZ Donhoffer: Acta Physiol Hung. Acad. Sci. Hung. 1959; 16: 197-201.
M Rutgers, FA Heusdens, F Bonthuis and TJ Visser. Endocrinology. Jul. 1989;125(1):433-43.
M Rutgers, FA Heusdens, TJ Visser. Endocrinology. Jul. 1989;125(1):424-32.
O'Connell, M. et al, "Changes in serum concentrations of 3,3',5'-triiiodothyronine and 3,5,3'-triiodothyronine during prolonged moderate exercise," J Clin Endocrinol Metab. Aug. 1979, V.49(2), pp. 242-246.
Epstein, Y. et al.,"Serum 3,5,3'-triiodothyronine and 3,3',5'-triiodothyronine concentrations during acute heat load," J Clin Endocrinol Metab. Nov. 1979, V. 49(5), pp. 677-678.
"Sur le metabolisme de la 3:3':5'-triiodothyronine," Biochimica et Biophysica Acta. Dec. 1956, V.22 (3), pp. 550-557.
"Inhibition of Thyroxine Action By 3,3',5'-Triiodothyronine," Endocrinology, V. 64 (3), pp. 466-468.
"Metabolic effects of thyroid hormone derivatives," Thriod, Feb. 2008, (2), pp. 239-253.
Pittman et al., "Biological Activity of 3,3',5'-Triiodo-DL-Thyronine," Endocrinology, V. 70 (1), pp. 79-83.
Sachs, Marvin L., "Abnormalities of cholesterol metabolism in hypothyroidism and the effects of treatment with thyroid hormones and thyroxin analogues," Journal of Chronic Diseases, Nov. 1961, V. 14 (5), pp. 515-536.

* cited by examiner

*Primary Examiner* — Anand U Desai
*Assistant Examiner* — Melissa S Mercier
(74) *Attorney, Agent, or Firm* — Booth Udall, PLC

(57) **ABSTRACT**

The present invention relates to a method of administering an effective amount of a diiodothyroacetic acid in order to shift the proportion between lean body mass and adipose tissue in favor of lean body mass in human individuals.

**15 Claims, No Drawings**

US 7,919,533 B2

1

## DIIODOTHYROACETIC ACID AND METHOD OF USE

### BACKGROUND OF INVENTION

Over recent years obesity has reached epidemic proportions. Obesity contributes to more than 300,000 deaths each year and according to federal guidelines, half the population is overweight and a third is obese. Obesity is defined as an excess proportion of total body fat correlating with a body weight greater than 20 percent of ideal body weight (IBW). Body Mass Index (BMI) is another method to determine whether or not an individual is obese. BMI utilizes a mathematical equation consisting of weight and height measurements in order to determine total body fat. A BMI between 25-29.9 indicates an individual is overweight. Causes for obesity include genetic, environmental, economic, emotional, and physiological factors. These factors can then lead to the over consumption of total calories. The amount of total calories consumed versus the amount of total calories burned determines the amount of fat stored for energy reserves. Calories or Kcals (kilocalories) are defined as the amount of heat necessary to raise the temperature of 1 gram of water 1 degree Celsius. The amount of total calories burned is defined as the calories utilized by exercise plus basal metabolic rate (BMR) or resting metabolic rate (RMR). BMR represents the amount of calories needed to maintain IBW at rest. Increasing BMR results in fewer calories stored as fat and can promote weight loss if the amount calories burned is greater than the amount of calories ingested. One of the main factors that controls BMR is the percentage of lean body weight.

Standard medical therapy for obesity includes oral prescription medications. Most of these medications are designed to regulate appetite by releasing serotonin or catecholamine. For instance Sanorex, Mazanor, Adipex-P, and Meridia are common appetite suppressant medications. However most of these medications can only be used on a short term basis and are scheduled as controlled substances due to the fact that they can become addictive. Other side effects include increased heart rate, blood pressure, constipation and insomnia. Merida is the only appetite suppressant that has been approved for long term use. Another long term pharmaceutical approach to weight loss is the fat absorption inhibitor Xenical. Xenical works by blocking about 30 percent of dietary fat from being absorbed. Enzymes in the digestive system, called lipases, assist in the digestion of dietary fats. Xenical attaches to the lipases and inhibits the digestion of dietary fat as triglycerides into absorbable free fatty acids and monoglycerides, which are then excreted in the bowel. Xenical literature recommends not ingesting more than 30 percent of total calories from dietary fat per day due to concerns regarding loose bowels. It appears that a common and unpleasant side effect of Xenical includes flatulence and loose bowels when a high fat diet is consumed during Xenical treatment.

The previously mentioned weight control methods do not take into account the importance of maintaining or increasing the lean body mass in the process of weight loss. Medical methods to decrease body fat often contribute to the catabolic wasting of lean body mass. Increased lean body mass enhances metabolism and helps in losing fat weight, as well as maintaining the accomplished weight reduction. Diminished lean body mass decreases metabolism and results in difficulties in maintaining healthy body weight. An ideal weight management approach should be to reduce body weight to acceptable levels by restoring the optimal proportions of fat to lean body mass. By maintaining or increasing

2

the lean body mass while simultaneously reducing body fat, the weight loss regimen would serve the general purpose of improving the overall health of the individual.

The present invention relates to a method of administering an effective amount of an iodothyroacetic acid analog in order to shift the proportion between lean body mass and adipose tissue in favor of lean body mass in a human individual. Iodothyronines traditionally have been utilized to treat thyroid disorders such as hypo and hyper thyroidism. The most common iodothyronines consist of tetraiodothyronine (T4), triiodothyronine (T3), diiodothyronine (T2), and monoiodothyronine (T1) but also include the acetic acid analogs Tetraiodothyroacetic Acid (TETRAC or TA4) and Triiodothyroacetic Acid (TRIAC or TA3). We purpose for the first time that the use of diiodothyroacetic acid (TA2) is novel and unobvious due to its ability to shift the proportion between lean body mass and adipose tissue in favor of lean body mass without causing sympathomimetic stimulation, loose bowel or addictive symptomology commonly associated with obesity related prescription and over the counter medications. This unobvious function can also increase the variables associated with physical performance for the regulation of athletic function in humans.

The thyroid gland, in response to stimulation by TSH, produces 3,5,3',5'-tetraiodothyronine (T4), T3, and reverseT3. The synthesis of these hormones requires the amino acid tyrosine and the trace mineral iodine. Within the cells of the thyroid gland, iodide is oxidized to iodine by hydrogen peroxide, a reaction termed the organification of iodide. Iodine then binds to the number 3 position in the tyrosyl ring in a reaction catalyzed by the thyroid peroxidase enzyme, a reaction yielding 3-monoiodotyrosine (MIT). A subsequent addition of another iodine to the number 5 position of the tyrosyl residue on MIT creates 3,5-diiodotyrosine (DIT). T4 is created by the condensation or coupling of two DIT molecules. Within the thyroid, smaller amounts of DIT can also condense with MIT to form either T3 or reverseT3.

Iodothyronines have been patented for a number of applications. For instance, U.S. Pat. No. 4,673,691 by Bachynsky demonstrates a method for inducing human weight loss. U.S. Pat. No. 5,910,569 by Latham et al. describes a method for the use of iodothyronine polymers for the treatment of thyroid disorders. U.S. Pat. No. 6,380,255 by Lavin et al. describes a method for the treatment of dermal skin atrophy using thyroid hormone compounds.

The iodothyroacetic acid analogs utilized in this invention consist of all isomers, esters, salts, ethers, metabolites and analogs of diiodothyroacetic acid. This naturally occurring acetic acid analog is a direct metabolite of triiodothyronine (T3) and triiodothyroacetic acid (Triac) as demonstrated in Endocrinology October 1990; 127(4): 1617-24 and Endocrinology July 1989; 125(1): 424-32. It should be understood that this invention is not construed as limited in scope by the details contained therein, as it is apparent to those skilled in the art that modification in materials and methods can be made without deviating from the scope of the invention.

U.S. Pat. No. 4,673,691 by Bachynsky describes a method for human weight reduction with 2,4-dinitrophenol and a thyroid hormone. The dinitrophenol is administered to elevate body temperature, while the thyroid preparation is utilized maintain T3 levels that were present at the onset of the treatment. This invention represents an improvement in standard weight loss preparations due to the combination of dinitrophenol and T3. This combination represents an improvement in the use of dinitrophenol for weight loss although dinitrophenol is toxic and may lead to adverse reactions. U.S. Pat. No. 4,673,691 by Bachynsky addresses weight loss while

US 7,919,533 B2

3

the present invention focuses on shifting the proportion between lean body mass and adipose tissue in favor of lean body mass. This combination represents an improvement in the use of dinitrophenol for weight loss although dinitrophenol is toxic and may lead to adverse reactions.

U.S. Pat. No. 5,910,569 by Latham et al. describes a method for the synthesis of various iodothyronine polymers for use in the treatment of thyroid disorders. Since these iodothyronine polymers are released by digestive proteolysis it is expected that they would have a long physiologic effect because of the sustained release from the polymers of the monomeric thyroid hormones and thus give stable, consistent pharmaceutical compositions for the treatment of thyroid hormone deficiencies. This combination represent an improvement in the use of iodothyronines for the treatment of thyroid hormone deficiencies although these polymers do not address the use of diiodothyroacetic acid to shift the proportion between lean body mass and adipose tissue in favor of lean body mass.

U.S. Pat. No. 6,380,550 by Lavin describes a method for treating dermal atrophy of the skin. Lavin has found that topical application of a composition comprising at least one thyroid hormone compound or thyroid hormone-like compound in a pharmacologically acceptable base is effective in treating dermal atrophy of the skin. It also provides an improved cosmetic appearance to aging, atrophied, steroid-affected, or sun damaged skin. This combination represents a novel and unobvious use of iodothyronines for the treatment of dermal atrophy of the skin although this invention does not address the use of diiodothyroacetic acid to shift the proportion between lean body mass and adipose tissue in favor of lean body mass.

## SUMMARY OF INVENTION

The present invention relates to a method of administering an effective amount of an iodothyroacetic acid in order to shift the proportion between lean body mass and adipose tissue in favor of lean body mass in a human individual. This unobvious function can also increase the variables associated with physical performance for the regulation of athletic function in humans. The method comprises administering to humans an effective amount of a composition consisting of an iodothyroacetic acid such as but not limited to all isomers, esters, salts, ethers, metabolites and analogs of 3,3' diiodothyroacetic acid and 3,5 diiodothyroacetic acid.

Diiodothyroacetic acid exerts a direct enhancement of metabolic rate via an increase in oxygen consumption and body temperature. This increase in metabolic rate results in an enhancement of the utilization of orally consumed nutrients. 3,3' diiodothyroacetic acid is a precursor to T3, Triac, and T2. Small increases in T3 result in increased protein synthesis for muscle tissue accretion. Thus the said compound can be given to humans either in conjunction with or without a high protein diet (1.25 to 1.8 grams protein/kilogram of body weight) and proper anaerobic training program in order to shift the proportion between lean body mass and adipose tissue in favor of lean body mass for the regulation body weight.

## DETAILED DESCRIPTION

The chemical term iodothyroacetic acid may refer to but is not limited to 3,3' diiodothyroacetic acid and 3,5 diiodothyroacetic acid. Possible alternatives include all isomers, esters, salts, ethers, metabolites and analogs of diiodothyroacetic acid. This invention concerns a diiodothyroacetic acid and all previously mentioned alternatives. The previous examples of

4

various diiodothyroacetic acids are presented by way of illustration only. It should be understood that this invention is not construed as limited in scope by the details contained therein, as it is apparent to those skilled in the art that modifications in materials and methods can be made without deviating from the scope of the invention.

The iodoamino acids TA4 and TA3 are products of deamination and oxidative decarboxylation of T4 and T3 and have been detected in serum by direct RIA measurements. Reported mean concentrations in the serum of healthy adults have been 8.7 nanograms per deciliter and 2.6 nanograms per deciliter for TA3 and 28 nanograms per deciliter for TA4. Serum TA4 levels are reduced during fasting and in patients with severe illness, although the percentage of conversion of T4 to TA4 is increased. The concentration of serum TA3 remains unchanged during the administration of replacement doses of T4 and T3. It has been suggested that intracellular rerouting of T3 to TA3 during fasting is responsible for the maintenance of normal serum TSH levels in the presence of low T3 concentrations.

The sulfate conjugate 3,3'-diiodothyroacetic acid (3,3'-TA2S) was discovered in the serum, and occasionally in bile, of 6-propyl-2-thiouracil-treated rats after administration of T3 as shown in Endocrinology October 1990; 127(4): 1617-24. The significant plasma 3,3'-TA2S levels, even in unanesthetized animals, illustrate the physiological relevance of this T3 metabolite. Diiodothyroacetic acid is a direct naturally occurring metabolite of T3, Triac, and T2, which has never been investigated or sold as a new drug therefore it may be sold as a dietary supplement.

The biosynthetic pathway of diiodothyroacetic acid is unique in that it possesses several direct pathways to different thyroid hormones in contrast to other acetic acid analogs such as T3A and T4A. Diiodothyroacetic acid has direct reversible pathways to T3, Triac and T2. The ability to increase the levels of these different thyroid hormones is one aspect of diiodothyroacetic acid uniqueness. The other aspect is its ability to shift the proportion between lean body mass and adipose tissue in favor of lean body mass via small increases in T3 for enhanced protein synthesis and muscle tissue accretion.

Without being bound to any theory, effective administration of diiodothyroacetic acid shifts the proportion between lean body mass and adipose tissue in favor of lean body mass due to its location in the thyroid biosynthetic pathway. Diiodothyroacetic acid exerts a direct enhancement of metabolic rate via an increase in oxygen consumption and body temperature. This increase in metabolic rate results in an enhancement of the utilization of orally consumed nutrients. Diiodothyroacetic acid acts as a precursor hormone resulting in specific small increases in T3, Triac, and T2. Small increases in T3 facilitate protein synthesis for muscle anabolism. In the present method of promoting lean body mass, diiodothyroacetic acid should be administered in a daily dose of from about 1 mcg to about 6 mg. It is preferred that the daily dose be divided into a plurality of individual doses. It is further preferred that three to six individual doses be used. In any case, the individual doses are preferably from about 100 mcg to about 1 mg each. After every 4 weeks of continual use, a 2-week cessation period is recommended. Thus the said compound can be given to humans either in conjunction with or without a high protein diet (1.25 to 1.8 grams protein per kilogram of body weight) and proper anaerobic training program in order to shift the proportion between lean body mass and adipose tissue in favor of lean body mass for the purpose of body weight regulation.

US 7,919,533 B2

| 5 | 6 |

After an extensive review of the scientific literature and previous patents regarding the ability of diiodothyroacetic acid to alter body composition, it then became the focus of this invention that all isomers, esters, salts, ethers, metabolites and analogs of diiodothyroacetic acid could be administrated perorally as an effective means to shift the proportion between lean body mass and adipose tissue in favor of lean body mass in humans. The oral daily doses can be between 1 mcg to 6 mg per day. The preferred daily dosing schedule should be divided into 3-6 sub dose applications per day in order maintain adequate blood hormone concentrations. In addition to peroral use, several other routes including transdermal, sublingual, intranasal, and parenteral administration may be effectively utilized.

What is claimed is:

1. A method of promoting lean body mass in a human individual having a body mass index of at least 25, comprising directly administering to the individual an effective amount of diiodothyroacetic acid.

2. The method of claim 1, wherein the diiodothyroacetic acid comprises one of 3,3' diiodothyroacetic acid and 3,5 diiodothyroacetic acid.

3. The method of claim 1, wherein the diiodothyroacetic acid is selected from the group consisting of diiodothyroacetic acid isomers, esters, salts, and ethers thereof.

4. The method of claim 1, wherein administration is selected from the group comprising peroral, transdermal, sublingual, intranasal, and parenteral administration.

5. The method of claim 1, wherein the diiodothyroacetic acid is administered in a daily dose in a range of about 1 microgram to about 6 milligrams.

6. A method of increasing a proportion of lean body mass to adipose tissue in a human individual having a body mass index of at least 25, comprising directly administering to the individual an effective amount of diiodothyroacetic acid.

7. The method of claim 6, wherein the diiodothyroacetic acid comprises one of 3,3' diiodothyroacetic acid and 3,5 diiodothyroacetic acid.

8. The method of claim 6, wherein the diiodothyroacetic acid is selected from the group consisting of diiodothyroacetic acid isomers, esters, salts, and ethers thereof.

9. The method of claim 6, wherein administration may be selected from the group comprising peroral, transdermal, sublingual, intranasal, and parenteral administration.

10. The method of claim 6, wherein the diiodothyroacetic acid is administered in a daily dose in a range of about 1 microgram to about 6 milligrams.

11. A dietary supplement comprising diiodothyroacetic acid.

12. The composition of claim 11, wherein the diiodothyroacetic acid comprises one of 3,3' diiodothyroacetic acid and 3,5 diiodothyroacetic acid.

13. The composition of claim 11, wherein the diiodothyroacetic acid is selected from the group consisting of diiodothyroacetic acid isomers, esters, salts, and ethers thereof.

14. The composition of claim 11, wherein administration is selected from the group comprising peroral, transdermal, sublingual, intranasal, and parenteral administration.

15. The composition of claim 11, wherein the diiodothyroacetic acid is administered in a daily dose in a range of about 1 microgram to about 6 milligrams.

*   *   *   *   *

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 3 – Bates labeled documents CREA005-22

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:25 PM
**To:** 'sales@dymatize.com'; 'marketing@dymatize.com'; 'purchasing@dymatize.com'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

PLAINTIFF'S
EXHIBIT
4
TC 2-7-13
PENGAD 800.631-6989

CREA-005





## Creative Compounds

is pleased to introduce DIACtive brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

### What does DIACtive do?

1. Powerfully increases metabolism

2. Noticeably initiates the shedding of large quantities of adipose tissue

3. Protects precious muscle tissue from being destroyed while losing weight

4. Anabolic! Helps build muscle with a calorie surplus

5. Reduces cholesterol and triglyceride levels

6. No jittery feelings...no side effects

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-006

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:29 PM
**To:** 'purchasing@thermolife.com'; 'ron@thermolife.com'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CREA-009





## Creative Compounds

is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-010

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:25 PM
**To:** 'sales@molecularnutrition.net'; 'customerservice@molecularnutrition.net'; 'purchasing@molecularnutrition.net'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage.  We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.  Beware of other diiodothyroacetic acid products on the market that are not pure!  Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CREA-011





## Creative Compounds

Is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-012

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:25 PM
**To:** 'info@sann.net'; 'sales@sann.net'; 'purchasing@sann.net'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CREA- 013





## Creative Compounds

is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

**Beware** of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-014

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:27 PM
**To:** 'scott.baum@bsnonline.net'; 'jon.bukowski@bsnonline.net'; Casey Crane (casey.crane@bsnonline.net);
'jon.richmond@bsnonline.net'; 'matthew.henderson@bsnonline.net'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting
dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all
of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly
formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodiothyroacetic acid
products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an
extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the
lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CREA-015





## Creative Compounds

is pleased to introduce DIACtive brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-016

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:24 PM
**To:** 'ceo@zonehalo.com'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CRFA-017





## Creative Compounds

is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-018

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:25 PM
**To:** 'cs@usplabsdirect.com'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.





## Creative Compounds

is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-020

**From:** Customer Service [mailto:customerservice@creativecompounds.com]
**Sent:** Thursday, September 22, 2011 4:25 PM
**To:** 'sales@dymatize.com'; 'marketing@dymatize.com'; 'purchasing@dymatize.com'
**Subject:** DIACtive diiodothyroacetic acid (DIAC)

Creative Compounds is pleased to introduce *DIACtive* brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market. Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

Please see attached product summary and contact Creative Compounds today for more info.

CREA-021





## Creative Compounds

is pleased to introduce **DIACtive** brand of diiodothyroacetic acid (DIAC), one of the most exciting dietary supplements of the decade. Having worked extensively with this novel ingredient, Creative Compounds knows all of the intricacies surrounding its pharmacology and usage. We have the unique ability to help your company properly formulate and integrate this ingredient into a top selling product on the market.

Beware of other diiodothyroacetic acid products on the market that are not pure! Beware of other products on the market that are highly diluted but sell for an extremely high price. DIACtive is the most pure, highest quality DIAC in the industry and is GUARANTEED to be the lowest price diiodothyroacetic acid in the industry.

*What does DIACtive do?*

*1. Powerfully increases metabolism*

*2. Noticeably initiates the shedding of large quantities of adipose tissue*

*3. Protects precious muscle tissue from being destroyed while losing weight*

*4. Anabolic! Helps build muscle with a calorie surplus*

*5. Reduces cholesterol and triglyceride levels*

*6. No jittery feelings...no side effects*

**Remember!** Stop paying too much for overpriced, low quality DIAC. Contact Creative Compounds and get the best quality at the lowest price!

CREA-022

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 4 – C. McNeely Deposition taken on 2/12/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

RON KRAMER, an Arizona    )
resident; SAL ABRAHAM, a )
Florida resident;         )
THERMOLIFE INTERNATIONAL )
LLC, an Arizona limited   )
liability company,        )
                          )
          Plaintiffs,     )
                          )
          vs.             )Case No.
                          )2:11-cv-01965-PHX-JAT  (Lead)
                          )2:11-cv-02033-PHX-JAT  (Cons)
CREATIVE COMPOUNDS LLC,   )
a Nevada limited          )
liability company,        )
                          )
          Defendant.      )
_____)
                          )
CREATIVE COMPOUNDS LLC    )
a Nevada limited          )
liability company,        )
                          )
          Plaintiff,      )
                          )
          vs.             )
                          )
RON KRAMER, an Arizona    )
resident; and SAL         )
ABRAHAM, a Florida        )
resident,                 )
                          )
          Defendants.     )

DEPOSITION OF COREY MCNEELY
TAKEN ON BEHALF OF THE PLAINTIFFS
FEBRUARY 12, 2013
(Starting time of the deposition: 9:07 a.m.)

REPORTED BY: JOANNA CHARLTON, RPR, CCR(MO), CSR(IL)
JOB NO. 174595

COREY MCNEELY - 2/12/2013

1      an e-mail that was related -- for Marisa that was

2      related to this; right?

3              A.   What was the last part?

4              Q.   You don't ever remember seeing an e-mail

5      from Marisa that was related to this advertisement

6      for DIAC; right?

7              A.   No, not that I remember.

8              Q.   Has Creative Compounds ever sold any form

9      of DIAC?

10             A.   No, I don't think so.

11             Q.   Does Creative Compounds intend to sell DIAC

12     in the future?

13             A.   Yeah.

14             Q.   Why?

15             A.   I mean, we want to offer, you know, any

16     ingredient that we've got, you know, a demand for, I

17     mean, or -- I mean, any -- especially an ingredient

18     like this ingredients that are, you know, they've --

19     they're already being used in the market, and we do

20     get e-mails from customers asking about the compound

21     still.  So we're getting requests for it.  It's

22     already being used in products.  It's a higher dollar

23     ingredient with a good profit margin on it.

24     Generally with those kinds of ingredients too we can

25     fly those in quickly instead of keeping a lot of U.S.

COREY MCNEELY - 2/12/2013

1   stock or having to move it by ocean like you do with

2   some of the lower cost more commodity ingredients.  I

3   mean, anything with those kind of factors with it is

4   something we definitely want to sell.

5       Q.  You said Creative Compounds has received

6   requests for the product.  What requests has Creative

7   Compounds received for DIAC?

8       A.  I mean, we get requests for quotes into

9   sales e-mail and, you know, into regional managers.

10  I get them directly to me where customers will send

11  us a listing of ingredients asking if we can supply

12  them, and I know I've seen -- I've seen requests for

13  diiodothyroacetic acid several times over the past --

14  it's probably at least the last four or five years.

15  I don't know, but it's one that pops up once in a

16  while where customers asking about it.

17      Q.  Do you know if this advertisement was sent

18  to anyone who was asking about DIAC?

19      A.  No.  I think this was mainly sent to

20  customers that or people that already had it in a

21  finished product.

22      Q.  When customers or potential customers have

23  inquired about DIAC, what do you tell them?

24      A.  Normally -- it depends on the ingredient,

25  but normally we need to know what kind of quantity

COREY MCNEELY - 2/12/2013

1    they're looking for, what kind of lead time they need
2    on the ingredient, and then we can go from there
3    figure out, you know, pricing and figure out if
4    it's -- like, if it's something we need to fly in,
5    then we can figure out if we're going to be able to
6    move quickly enough to deliver it or if we're just
7    kind of outside their timeframe, if it's something
8    urgent, you know, and some of that --
9         Q.   Have you ever offered to sell DIAC to any
10   one of the companies that has inquired about it?
11        A.   I don't know.  I'd have to look back at the
12   e-mails, because like I said, they're e-mails that
13   are scattered over a long period of time.
14        Q.   Has Creative Compounds done any research
15   regarding the market for DIAC?
16        A.   I mean, that's -- that's going to be
17   limited to, you know, just kind of looking and seeing
18   what products are already on the market that have the
19   ingredient in them.
20        Q.   Anything else that you know that Creative
21   Compounds has done to determine the market for DIAC?
22        A.   No.  That would be the starting point.
23        Q.   You said it was the starting point, but can
24   you think of anything else that Creative Compounds
25   has done to determine the market?

COREY MCNEELY - 2/12/2013

1        A.   I don't know exactly what you mean by

2   determine the market.

3        Q.   Well, most companies before they come out

4   with a product they try and determine whether or not

5   there's enough customers in the market to buy it,

6   whether or not there's enough customers out there

7   that want it in order to make the money off of it.

8   Would you agree with that?

9        A.   Yes.

10        Q.   Other than looking at what companies are

11   selling products with DIAC in it, what else has

12   Creative Compounds done to determine the market for

13   DIAC?

14        A.   A lot of the information is going to have

15   to be provided from the customers we contacted

16   initially because, you know, I don't know their

17   quantities.  I don't know how frequently they're

18   running their products.  One thing that helps with

19   that, though, is that the DIAC is a more expensive

20   ingredient, so, you know, even if you aren't dealing

21   with huge quanties on it you're still dealing with

22   pretty decent dollar amounts.

23        Q.   Take a look at CREA006, which is part of

24   Exhibit 7.  Do you have that in front of you?

25        A.   006?

COREY MCNEELY - 2/12/2013

```
 1          Q.  006, yes.
 2          A.  Yes.
 3          Q.  I'm going to call this page an
 4     advertisement.  Do you know who prepared this
 5     advertisement for Creative?
 6          A.  Derek helped with the majority of the text,
 7     and then I reviewed it before we sent it out.
 8          Q.  Is this something that Creative Compounds
 9     creates in-house?
10          A.  What do you mean?
11          Q.  I mean do you hop on a computer at your
12     office and, you know, prepare an advertisement like
13     this, or do you have to hire a company to prepare an
14     advertisement like this that's professional?
15          A.  Yeah.  I mean, we would use a graphic
16     designer to put the trade logo together and, you
17     know, put the one page I guess you could call it a
18     flier or an advertisement together.
19          Q.  Okay.  Do you know what company you used
20     for this product?
21          A.  Idyllic Service put this together for us.
22          Q.  And Creative Compounds uses Idyllic Service
23     for other advertising?
24          A.  Yeah.
25          Q.  And that's a company that Derek Cornelius
```

COREY MCNEELY - 2/12/2013

1    owns?

2         A.   I don't know that.

3         Q.   Do you know how many Idyllic Services

4    charged for this advertisement?

5         A.   I don't know.  I think it was probably just

6    an hourly, you know, however long it took them to put

7    the logo together and just format this, you know, one

8    page -- one-page ad.

9         Q.   How much does a one-page advertisement like

10   this typically cost?

11        A.   I don't know.

12        Q.   Do you think it's less than a thousand

13   dollars?

14        A.   I would just be speculating.  I don't know.

15   Like I said, it's just an hourly.

16        Q.   Okay.  Has Creative Compounds done any

17   research to determine whether or not DIAC is DSHEA

18   compliant?

19        A.   DSHEA.

20        Q.   Yeah, DSHEA, yeah.

21        A.   No, I haven't.

22        Q.   Do you know if anyone at Creative Compounds

23   has done any research on that?

24        A.   Not that I'm aware of.

25        Q.   These advertisements that are here as

1   Exhibit 7 do you agree that these advertisements

2   market DIAC as a dietary supplement?

3        A.   No.   I mean, it's just marketed as a raw

4   ingredient, bulk raw ingredient.

5        Q.   Okay.   Would you agree that it's marketed

6   as a bulk raw ingredient for inclusion in a dietary

7   supplement?

8        A.   I mean, we sent the advertisement to

9   dietary supplement companies, but we don't make any

10  dietary supplements.   We don't do any blending or

11  bottling or processing or any kind of finished

12  products like that.

13       Q.   But do you think that this advertisement

14  was to have one of these companies buy DIACtive and

15  use it in a dietary supplement; correct?

16       A.   Yes.

17       Q.   Do you know if DIACtive by itself could be

18  sold as a dietary supplement?

19       A.   I'm sorry, could you say it again?

20       Q.   Sometimes dietary supplements have multiple

21  ingredients and raw materials; correct?

22       A.   Right.

23       Q.   But other dietary supplements will only

24  have one raw material or ingredient; correct?

25       A.   Right.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 5 – Expert Report of John A. Bundy, PhD, CMI



JOHN A. BUDNY, Ph.D
President

February 22, 2013

Mr. Gregory B. Collins
Kercsmar & Feltus PLLC          Sent Via Email: gbc@kflawaz.com
6263 N. Scottsdale Road
Suite 320 (South Lobby)
Scottsdale, AZ 85250

RE:    ThermoLife, LLC v Creative Compounds, LLC

Dear Mr. Collins:

You asked me to review and assess the advertising and promotional material for a
product called "DIACtive" in the context of Claim 11 of US 7,919,533B2. A company
named Creative Compounds is promoting "DIACtive" as a brand of a dietary supplement
that contains diiodothyroacetic (DIAC). The subject matter of US 7,919,533B2, which
was granted on April 5, 2011, describes a dietary supplement composition containing
DIAC. Claim 11 of the patent, in its entirety, states: "A dietary supplement comprising
diiodothyroacetic acid." Specifically you asked me to determine if the description of
DIAC in "DIACtive" is the same material described in US 7,919,533B2, Claim 11.

Introduction

A comparison of the technical content of US 7,919,533B2 to the advertising and
promotional material produced and used by Creative Compounds for their product
DIACtive is within my area of expertise. Furthermore, I have the requisite education,
background and experience to conduct the analysis you requested and to opine on the
content of the advertising material in comparison to US 7,919,533B2, specifically Claim
11.

Qualifications

My CV is attached; however, there are specific items that are germane to validating my
opinions.

I have an undergraduate degree in chemistry and I taught chemistry to college
engineering students for a year while doing post-graduate work in chemistry after
receiving my BS degree. The year following my post-graduate studies and teaching, I

entered the graduate degree program at The Ohio State University College of Medicine where I received my doctorate in Medical Biochemistry. After receiving my PhD, I worked in industry as a toxicologist and medical biochemist in various capacities in product development for a diverse array of products and industries. While working in industry, I received my MBA degree in Business Management.

In addition to my education and industrial experience, I have served as a consultant for various types of product development projects for health-related consumer and medical products, including nutraceuticals and dietary supplements. I have been a consultant to nutritional and dietary supplement companies for their preclinical and pre-marketing programs. I am on the Editorial Board of the International Journal of Toxicology and in that capacity I publish book reviews on life science topics including dietary supplements. As a member of the Editorial Board, I also review manuscripts of original research on dietary supplements that are submitted to the journal for publication. I have also been retained as an expert witness for cases that require opinions based on my expertise in toxicology, biochemistry, patents and trade secret information which is used for criminal and civil prosecutions, litigations and medical investigations. I am a Certified Medical Investigator.

## Claim 11 of US 7,919,533B2

Claim 11 of US 7,919,533B2 in its entirety states: "A dietary supplement comprising diiodothyroacetic acid." Claim 11 is an important component of the subject patent which describes the use of iodated compounds for use as dietary supplements to regulate metabolic function.

The recognition that a functioning thyroid gland can regulate metabolism is not new. However, only recently contributions of various iodated products produced by the thyroid gland are beginning to be understood in the regulation of complex mammalian metabolic processes. The most apparent and important clarification has been that the various iodated thyroid products focus their regulatory influences on metabolism in different ways and, most likely, by different mechanisms. It was accurate in the past, and for a large measure it is still true today, to classify iodated thyroid products as metabolic stimulators or activators. However, the evolving understanding of how various iodated products produced by the thyroid gland regulate metabolism, is making it clear that these iodated chemicals regulate anabolic and catabolic aspects of metabolism in disproportionate ways. Furthermore, there are isomers or variations in molecular structures for each of the iodated products, not all of which may have biologic activity, which add complexity to understanding of how iodated chemicals affect the various aspects of metabolism.

The complete US 7,919,533B2 patent recognizes and appreciates the evolving understanding of how specific iodated thyroid gland products can regulate metabolic function to achieve a desired physiologic effect. Claim 11 identifies diiodothyroacetic acid without specification as to any specific isomer or where the Iodine atoms are located in the molecule, as key component of the invention.

2

DIACtive Advertising and Promotional Material

Creative Compounds admits in advertising and promotional material for DIACtive brand that the composition contains diiodothyroacetic acid (DIAC) and that "DIACtive is the most pure, highest quality DIAC in the industry . . ."  Furthermore, the assertion that "DIACtive is the most pure, highest quality DIAC in the industry . . ." is meaningless and misleading.  Creative Compounds does not specify whether their claimed purity is isomeric purity i.e. positional isomers of the two Iodine atoms, free of tri- or tetra-iodothyroacetic molecules or impurities generated in the synthesis of diiodothyroacetic acid.  Claims of purity underscore the presence of diiodothyroacetic acid in DIACtive.

Opinions

1. Within an absolute degree of scientific certainty, in light of recent advances in nutritional and physiological research, a focused regulation of metabolism can be achieved with a dietary supplement composition containing diiodothyroacetic acid.
2. Within an absolute degree of certainty, US 7,919,533B2 makes claims for compositions containing diiodothyroacetic acid.
3. Within an absolute degree of certainty, Creative Compounds advertising and promotional materials claim that the DIACtive product contains DIAC which is diiodothyroacetic acid.
4. Within an absolute degree of scientific certainty under the same dosing conditions the metabolic regulation achieved with the DIACtive product would have the same metabolic regulation as products manufactured under the aegis of US 7,919,533B2.

Sincerely,

John A. Budny, PhD, CMI



JOHN A. BUDNY, Ph.D
President

# CURRICULUM VITAE

## Dr. John A. Budny, BCFE, FAIC, CMI-IV

TEL: (818)706-2410

E-MAIL: jabudny@earthlink.net

www.medtoxexpert.com

### Education:

| 1965 | Lewis University<br>Lockport, Illinois | BS Chemistry |
| 1970 | The Ohio State University,<br>College of Medicine<br>Columbus, Ohio | PhD Medical Biochemistry |
| 1983 | Pepperdine University<br>Malibu, California | MBA Business Management<br>(With Honors) |

### Experience:

1964-65    Instructor, Sacred Heart Academy
Lisle, Illinois

Taught high school chemistry.

1965-66    Instructor, Michigan Tech University
Houghton, Michigan

Taught college chemistry and took graduate courses in chemistry.

1969-70    Instructor, The Ohio State University College of Medicine
Columbus, Ohio

Taught laboratory course in biochemistry to medical and dental students.

1970-75    Staff Scientist, Procter and Gamble Company
Cincinnati, Ohio

Conducted health related research associated with product developments for

## Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

pharmaceuticals, food products, personal care products and consumer products.

**1975-79**   Chief Toxicologist, Diamond Shamrock Corporation
Cleveland, Ohio

Carried out and managed programs for the determination of health effects of pesticides and animal health care products for worldwide registrations. Managed a staff of 13 with responsibility for a budget of $3 Million.

**1979-87**   Manager, Health Sciences, Atlantic Richfield Company
Los Angeles, California

Directed and managed a staff of 10 professionals who provided expert knowledge on the health effects of petroleum products and chemicals. Had budget responsibility for $6 Million.

**1994-95**   American Faculty of the I. P. Pavlov First Medical Institute
St. Petersburg, Russia

Taught biochemistry and physiology to American medical students at the I. P. Pavlov First Medical Institute which was administered by R. A. M. I. (Russian American Medical Institute).

**2004-2005**   Instructor, University of California at San Diego (UCSD Extension)
San Diego, California

Instructs scientists, engineers and managers who are non-toxicologists in the fundamental concepts of toxicology for drug discovery and pharmaceutical product development.

**1987-Present**   President, PharmaCal, Ltd.
Westlake Village, California

Provides toxicological, pharmacological, biochemical and medical expertise. Determines cause-and-effect relationships. Serves as a testifying expert for medical malpractice (prescribing errors), pharmaceutical product liability, drugs of abuse, chemical exposures and consumer product exposures and liability.

## Honors:

- Who's Who Among Colleges and Universities
- Health, Education and Welfare (NIH) Fellow
- Who's Who in the Mid-West
- Pepperdine University; MBA Degree with HONORS.
- Who's Who Worldwide
- American Men and Women of Science, 1995-96, 1997
- Who's Who in Science and Engineering, 3rd and 4th Editions.

# Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

## Accomplishments:

- Designed, established and managed two technical organizations
- Managed contracted research in domestic and foreign laboratories and universities
- Negotiated the registration of regulated products with domestic and foreign regulatory agencies and advised health bodies regarding toxicity of products, including the World Health Organization
- Successfully managed budgets in excess of $5 Million
- Published in scientific journals and elected to a professional society
- Participated and chaired various committees and subcommittees in the National Agricultural Chemicals Association, Animal Health Institute, and the American Petroleum Institute
- Chaired the American Petroleum Institute's Cancer Policy Task Force that developed industry-wide approaches for assessing chronic health risks.

## Memberships:

- American Board of Forensic Examiners
- American College of Forensic Examiners
- American Board of Forensic Medicine
- Forensic Expert Witness Association
- American Chemical Society
- American Institute of Chemists, Fellow – FAIC
- Editorial Board, International Journal of Toxicology
- Society of Toxicology
- American College of Toxicology
- American Society of Microbiology
- American Association for the Advancement of Science
- New York Academy of Sciences
- Roundtable of Toxicology Consultants
- International Association for Dental Research
- American Veterinary Dental Society.

## Registrations and Certifications:

- Diplomate, American Board of Forensic Examiners - Certification # 088
- Diplomate, American Board of Forensic Medicine - Certification # 473
- Fellow, American College of Forensic Examiners - Certification # 352
- Certified Medical Investigator – Level IV (CMI-IV).

## Continuing Education:

- Certified Medical Investigator (CMI) Review Course and Examination. Regional Conference, American College of Forensic Examiners International, July 2006
- Basic Risk Assessment. Society of Toxicology Continuing Education Program
- Advanced Risk Assessment. Society of Toxicology Continuing Education Program
- Expert Witness Workshop. Society of Toxicology Continuing Education Program
- The Role of Expert Witness in the 1990s and Beyond. SEAK Legal and Medical Educators
- Principles of Food Microbiology. Silliker Laboratories
- Legal and Regulatory Aspects of Biotechnology. The American Chemical Society, Biotechnology

Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

Secretariat Symposium. 207th National ACS Meeting, Spring
- Emerging Environmental, Health, Safety and Legal Issues for Database Producers. 207th National ACS Meeting, Spring
- Epidemiology for Toxicologists. Society of Toxicology Continuing Education Program
- Advanced Topics in Toxicokinetics. Society of Toxicology Continuing Education Program
- Unique Problems Associated with the Use of Animals in Inhalation Toxicology. Society of Toxicology Continuing Education program
- The Role of Toxicology in Assessing the Safety and Risk of New Food Technologies and Practices. Society of Toxicology Continuing Education Program
- Advances in Forensic Science: Legal and Ethical Responsibilities; Henry Lee, PhD Instructor. American College of Forensic Examiners National Conference
- Certified Medical Investigator Certification Program; Cyril Wecht, MD, JD Instructor, American College of Forensic Examiners National Conference
- Photographic Evidence of diseases: Estimation of Acetylcholine, β-Amyloid, Al, Hg, *Chlamydia trachomatis* and *MycoBacterium tuberculosis* for Photographs of Different Parts of the Head and the Medical Basis for Abnormal Behavior; Yoshiaki Omura, MD, ScD. Instructor. American College of Forensic Examiners National Conference
- Toxicokinetics (TK) and Physiologically Based Toxicokinetics (PB-TK) in Pharmaceutical and Chemical Safety Assessment. American College of Toxicology Continuing Education Course
- Evaluation of Cardiac Drug Toxicity in Pharmaceutical Discovery and Development. Society of Toxicology, Continuing Education Course.
- American College of Forensic Examiners 2008 National Conference and Certified Medical Investigator Course, San Diego.
- Autopsy and Cause of Death. Legal Nurse Consultants of Southern California 2012 Continuing Education Program. Orange, CA.

## Jurisdictional Experience – Court and Deposition Testimony (Selected):

- United States District Court, Southern District of Texas
- United States District Court, District of Arizona
- District Court of Harris County, Texas, 165th Judicial District
- District Court of Harris County, Texas, 333rd Judicial District
- United States District Court, Western District of Washington at Seattle
- Superior Court of the State of California for the County of Los Angeles
- United States District Court, Eastern District of Pennsylvania
- Superior Court of the State of California for the County of San Bernardino
- Superior Court of the State of California for the County of Riverside
- Superior Court of the State of California for the County of Orange
- Superior Court of the State of California for the County of Merced
- 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

## Bibliography:

### Publications and Presentations

Budny, J. A., "An *In Vivo* and *In Vitro* Metabolic Comparison of the Linoleate and Palmitoleate Families of Polyunsaturated Fatty Acids." Dissertation, PhD, The Ohio State University, College of Medicine, Columbus, Ohio, 1970

Sprecher, H. W., Ullman, D., and Budny, J. A., "Chemical Synthesis of Poly- unsaturated Acids and Metabolism of Polyunsaturated Acids in Animals." Presented at the joint meeting of the American Oil

## Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

Chemists Society and the Xth Biennial Congress of the International Society for Fat Research, 1970

Budny, J. A. and Sprecher, H. W., "A Study of Some of the Factors Involved in Regulating the Conversion of Octadeca 8,11-dienoate and Eicosa 4,7,10,13-tetraenoate in the Rat." Biochim. Biophys. Acta, 239: 190-207 (1971)

Budny, J. A., "Metabolism and Blood Pressure Effect of Disodium Nitrilotriacetate (Na$_2$NTA) in Dogs." Toxicol. Appl. Pharmacol. 22: 655-660 (1972)

Budny, J. A. and Arnold, J. D., "A Comparison of the Metabolism of Nitrilotriacetate (NTA) in Dog and Man." Presented at the Society of Toxicology Annual Meeting, 1972

Budny, J. A., Michael, W. R., Wakim, J. M. and Arnold, J. D., " A Comparative Metabolic Study of Nitrilotriacetate (NTA) in Rat, Dog and Man." Presented at the Fifth International Congress on Pharmacology, San Francisco, 1972

Budny, J. A. and Arnold, J. D., "Nitrilotriacetate (NTA): Human Metabolism and Its Importance in the Total Safety Evaluation Program." Toxicol. Appl. Pharmacol., 25: 48-53 (1973)

Budny, J. A., Niewenhuis, R. J., Buehler, E. V, and Goldenthal, E. I., "Subacute Oral Toxicity of Trisodium Nitrilotriacetate (Na$_3$NTA) in Dogs." Toxicol. Appl. Pharmacol., 26: 148-153 (1973)

Triebwasser, K. C., Swan, P. B., Henderson, L. M. and Budny, J. A., "The Metabolism of D- and L-Tryptophan in Dogs," J. Nutr., 106: 642-652 (1976)

Triebwasser, K. C., Swan, P. B., Budny, J. A. and Henderson, L. M., "The Metabolism of D-Tryptophan and L-Tryptophan in Dogs." Fed. Proc., 35: 498 (1976)

Budny, J. A., Dow, R. C., Eccleston, D., Hill, A. G., and Ritchie, I. S., "A Comparison of D- and L-Tryptophan on the Cerebral Metabolism of Serotonin and Dopamine in the Dog." British J. Pharmacol., 58: 3-7 (1976)

Budny, J. A., "An Evaluation of the Degree of Centralization of Research and Development Functions in Industrial Firms." Thesis, MBA, Pepperdine University, School of Business and Management, Malibu, California, 1983

Budny, J. A., "Use of Enzymes in Packaging for Selective Removal of Lactose, Cholesterol, and Oxygen from Foods." Presented at PACK ALIMENTAIRE: Fourth Annual Food & Beverage Packaging Expo & Conference. Interactive Packaging: Novel Approaches to Product Protection, San Francisco, 1990

Brody, A. L. and Budny, J. A, "Enzymes as Active Packaging Agents" in Active Food Packaging, M. L. Rooney, ed. Blackie Academic & Professional, Chapman and Hall. New York, NY. 1995. pg. 174-192

Budny, J. A. "Animal Models: Hard Choices, New Opportunities, Electronic Discussion." Toxicology Update 1(#5, May), Pages 1 & 7 (1996)

Budny, J. A. "Doing Toxicology on the 'Net." Toxicology Update 1(#8, August), Page 7 (1996)

Budny, J. A. Book Review: Dietary Supplements, Second Edition, Ed. Pamela Mason; Pharmaceutical Press, London. 2001. Intl. Journal of Toxicology, 22(1), 66-67(2003)

Budny, J. A. "The Basic Science of Mold Toxicity." Presented at The Great Debate Symposium: Indoor Mold – Plague or Nuisance. The American College of Toxicology, 25th Annual Meeting, 2004

## Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

Budny, J. A. "A Toxicologist's View of Dietary Supplements." Presented at Regulations for Nutraceuticals. Intertech-Pira International Conference. October 26-27, 2006. Chicago, IL

Budny, J. A. Book Review: Computational Toxicology – Risk Assessment for Pharmaceutical and Environmental Chemicals. Ed. Sean Ekins; Wiley-Interscience, John Wiley & Sons, Inc., Hoboken, New Jersey. 2007. Intl. Journal of Toxicology, 27(1), 167-168(2008).

Budny, J. A. Book Review: Strive to Thrive, Five Volume Series. Ed. Mickey Sarquis; Terrific Science Press, Miami University Press, Middletown, OH. 2007. Intl. Journal of Toxicology, 27(4), 349-350(2008).

Budny, J. A. Book Review: Fundamentals of Analytical Toxicology. By Robert Flanagan, Andrew Taylor, Ian D. Watson and Robin Whelpton; John Wiley & Sons, Ltd., West Sussex, UK. 2007. Intl. Journal of Toxicology, 27(5), 397-398(2008).

Budny, J. A. Book Review: Preclinical Safety Evaluation of Biopharmaceuticals. Ed. Joy A. Cavagnaro; John Wiley & Sons, Inc., Hoboken, NJ. 2008. Intl. Journal of Toxicology, 28(2), 134-137(2009).

Budny, J. A. Book Review: Toxicology and Biochemistry of Insecticides. Yu, S. J. CRC Press, LLC, London, England. 2008. Intl. Journal of Toxicology, 28(4), 332-333(2009).

Budny, J. A. Book Review: Endogenous Toxins; Targets for Disease Treatment and Prevention. Eds.Peter J. O'Brien and W. Robert Bruce. Wiley-VCH Verlag GmbH & Co. KGaA. Weinheim, Germany. 2010. Intl. Journal of Toxicology, 29(6), 634-636(2010).

Budny, J. A. "Toxicology and Economics: A Necessary or Inevitable Marriage?" Intl. Journal of Toxicology, 30(4), 384(2011).

Budny, J. A. Book Review: Predictive Toxicology in Drug Safety. Eds. Jinghai J, Xu and Laszio Urban. Cambridge University Press. New York. 2011. Intl. Journal of Toxicology, 30(4), 452-454(2011).

Budny, J. A. Book Review: A Textbook of Modern Toxicology. Ed. Ernest Hodgson. John Wiley & Sons, Inc. Hoboken, NJ. 2010. Intl. Journal of Toxicology, 30(5), 592-593(2011).

Budny, J. A. Book Review: Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, National Research Council, Ed. Reference Manual on Scientific Evidence, Third Edition. The National Academies Press, 2011. Intl. Journal of Toxicology, 31(1), 95-96(2012).

Budny, J. A. "Persistent Organic Chemicals stage a Return . . . But the Stage has Changed," Intl. Journal of Toxicology, 31(2), 135-136(2012).

Budny, J. A. Book Review: Drug Metabolism and Pharmacokinetics Quick Guide. Eds. Siamak Cyrus Khojasteh, Harvey Wong and Cornelis E.C.A. Hop. Springer. New York, NY. 2011. Intl. Journal of Toxicology, 31(2), 203-204(2012).

Budny, J. A. Book Review: Leachables and Extractables Handbook: Safety Evaluation, Qualification, and Best Practices – Applied to Inhalation Drug Products. Eds. Ball, Douglas J., Daniel L. Norwood, Cheryl M. Stults and Lee M. Nagao. John Wiley & Sons, Inc. Hoboken, NJ. 2012. Intl. Journal of Toxicology, 31(5), 496-497(2012).

## Curriculum Vitae - Dr. John A. Budny, BCFE, FAIC, CMI-IV

### Patents

- US 5,871,714  "Compositions for Controlling Bacterial Colonization"
- US 6,159,447  "Compositions for Controlling Bacterial Colonization"
- US 6,830,745  "Compositions for Treating Biofilm"
- Ten US Patent Applications
- South Africa Patent #9819024 "Compositions for Controlling Bacterial Colonization"
- Turkey Patent No. TR 2000 00988B "Compositions for Controlling Bacterial Colonization"
- Eurasia Patent No. 002244 "Compositions for Controlling Bacterial Colonization"
- Australia Patent #742762 "Compositions for Controlling Bacterial Colonization"
- Singapore Patent #72313 "Compositions for Controlling Bacterial Colonization"
- Cuba Patent (Allowed) "Compositions for Controlling Bacterial Colonization"
- New Zealand Patent (Allowed) "Compositions for Controlling Bacterial Colonization."

### Confidential Reports

Over 350 declarations, depositions, court testimonies and confidential reports for clients and companies covering toxicological cause-and-effect relationships, adverse pharmaceutical events, effects of illicit drug use, human health risk assessments, hazard evaluations, environmental assessments, R&D analyses, and economic impact analyses. These reports covered pharmaceuticals, consumer products, personal care products, foods and food additives, nutraceuticals and dietary supplements, pesticides, animal health care products (veterinary pharmaceuticals), chemicals, petrochemicals and petroleum products.

12-11-20

# John A. Budny, PhD, CMI
# Court Experience

Superior Court of the State of California, County of Ventura
Marjan Ataipour
v.
Homayoon Khanlou
Case No. D 339 256
Trial Testimony on March 30, 2011


District Court Clark County, Nevada
Carla M. Lacombe, Administrator for the Estate of David Nichols (deceased), Donald
A. Nichols and Nancy Nichols
v.
Mark Luce, M.D., Dennis Chong, M.D., et al
Case No. A527569 DEPT. NO. XIII
Deposition on June 23, 2010


Superior Court of the State of California, County of Los Angeles, Northeast District –
Pasadena
Larry Ontiveros, Jr.; Jennifer L. Ontiveros
v.
Opteron 1, Inc. dba Nature and Health Company; Okaz, Inc. dba Gaspoint Shell and
Does 1 to 50
Case No.: GC041812
Deposition on April 22, 2010

February 22, 2013

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 6 – Defendant's Response to Plaintiff's First Set of Interrogatories

1   Thomas J. DeGroot (pro hac)
    LAW OFFICES OF THOMAS DEGROOT, LLC
2   7733 Forsyth Blvd., Suite 1100
    St. Louis, Missouri 63105
3   Telephone: (314) 812-2668
    Facsimile: (314) 296-6001
4   tom@degrootlaw.net

5   Attorney for Defendant Creative Compounds, LLC

6
                    UNITED STATES DISTRICT COURT
7
                    FOR THE DISTRICT OF ARIZONA
8

9   Ron Kramer, an Arizona resident; Sal        Case No. 2:11-cv-01965-PHX-JAT (Lead)
    Abraham, a Florida resident; ThermoLife                  2:11-cv-02033-PHX-JAT
10  International LLC, an Arizona limited                     (Cons)
    liability company,

11                  Plaintiffs,

12  v.                                          **DEFENDANT'S RESPONSE TO**
                                                **PLAINTIFFS' FIRST SET OF**
13  Creative Compounds LLC, a Nevada            **INTERROGATORIES**
    limited liability company,
14
                    Defendant.
15

16  Creative Compounds LLC, a Nevada
    limited liability company,
17
                    Plaintiff,
18
    v.
19
    Ron Kramer, an Arizona resident; and
20  Sal Abraham, a Florida resident,

21                  Defendants.

22

23          COMES NOW, Creative Compounds, LLC ("Creative"), and for its response to

24  Plaintiffs' First Set of Interrogatories, states as follows:

25
26          **GENERAL OBJECTIONS**

27          Creative objects to the General Instructions Plaintiffs purport to give with their

28

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

1

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

Interrogatories. Plaintiffs' purported General Instructions attempt to impose obligations beyond those imposed by the Federal Rules of Civil Procedure. For example, nothing the in the Federal Rules requires Creative to (1) divulge information either in its possession or in the possession of its counsel that is privileged, (2) explain its efforts to secure information to answer the interrogatories, (3) explain why any of its answers may be "unknown" or "not applicable," or (4) identify all facts relied on for any particular answer, identify lay witnesses who will or may be called to testify, or identify expert witnesses that may be called to testify at trial.[1]

Further, Creative objects that General Instruction no. 5 is vague, unduly burdensome, and overly broad. Creative has no obligation to disclose each person who has knowledge of the factual basis for why privilege is asserted. Finally, Creative objects to General Instruction no. 8 to the extent it attempts to impose any obligation in excess of the requirements of Rule 26 to supplement answers.

Creative further objects to Plaintiffs' definition of "predecessor entities" contained in fn.1 as part of Plaintiffs' definition of "Creative." The company that previously did business under the name "Syntrax," is not a predecessor of Creative, and Creative is not, and never has been, affiliated with such company. Creative cannot respond to Plaintiffs' Interrogatories on behalf of the company that previously did business under the name "Syntrax."

Creative further objects to Plaintiffs' definition of "identify" or "describe" contained in Plaintiffs' definition nos. 9-12 as being vague, overly broad, and unduly

---

[1] Such instructions also seek information about trial counsel's strategy and mental impressions which are protected under the work product privilege. Such questions also violate the terms of the Court's scheduling order. Creative will comply with the deadlines and obligations contained in the Court's scheduling order.

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

1   burdensome. Further, application of each of those definitions, along with their subparts,

2   to each Interrogatory causes Plaintiffs to greatly exceed the limit of 25 Interrogatories

3

4   they are entitled to ask under Rule 33.

5           Creative's response complies with its obligations under the Federal Rules.

6

7                               **INTERROGATORIES**

8   **INTERROGATORY NO. 1:**     Identify each and every factual and/or legal contention

9   that supports your contention that the '533 Patent is invalid.

10     **RESPONSE:**

11           In addition to its General Objections, Creative objects to this Interrogatory to the

12   extent it calls for the disclosure of trial counsel's mental impressions, which are protected

13

14   by the work product privilege and from disclosure by F.R.Civ.P. 26. Creative further

15   objects because discovery is on-going, and this contention interrogatory is premature.

16   Without waiving any of the foregoing objections, Derek Cornelius conceived of

17

18   diiodothyroacetic acid ("DIAC") as a nutritional supplement, and further as nutritional

19   supplement to promote lean body mass, in the fall of 2000. Mr. Cornelius thereafter

20   communicated with Francisco Tabak and Tolbiac SRL about the manufacture and supply

21   of DIAC, with such discussions occurring in and through late fall and early winter of

22

23   2000-2001. By approximately the end of February 2001, Mr. Cornelius had received from

24   Francisco Tabak an approximately 5 to 10 gram sample of DIAC. Among others, Mr.

25   Cornelius took doses of DIAC orally as a dietary supplement to test its efficacy to

26   promote lean body mass.

27

28

**INTERROGATORY NO. 2:**     Identify each and every factual and/or legal contention that supports your defense that you have not in the past nor are presently infringing the '533 Patent.

    **RESPONSE:**

    In addition to its General Objections, Creative objects to this Interrogatory to the extent it calls for the disclosure of trial counsel's mental impressions, which are protected by the work product privilege and from disclosure by F.R.Civ.P. 26. Creative further objects because discovery is on-going, and this contention interrogatory is premature. Without waiving any of the foregoing objections, as it has repeatedly told Plaintiffs, Creative has not sold and is not offering for sale any DIAC. It therefore has not, and is not, infringing Plaintiffs' invalid '533 Patent.

**INTERROGATORY NO. 3:**     Identify all prior art you contend render any claim of the '533 Patent invalid, or not infringed, and explain how such prior art renders the '533 patent claims invalid or not infringed by the Product.

    **RESPONSE:**

    In addition to its General Objections, Creative objects to this interrogatory because it seeks the disclosure of trial counsel's mental impressions which are protected from disclosure by the work product privilege. Creative further objects that this interrogatory prematurely seeks the disclosure of expert testimony. Creative will supply such information, if any, in compliance with the Court's scheduling order.

**INTERROGATORY NO. 4:**     If you intend to rely in any way at trial on any oral or written advice and/or opinion of counsel rendered to you regarding the invalidity, unenforceability and/or non-infringement of the '567 patent, state the date and the substance

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

4

of the advice or opinion on which you intend to rely at trial, identify the author or provid-er of the advice or opinion, state whether the advice or opinion was in writing, identify all persons who received the advice or opinion, identify all persons who received copies of the advice or the opinion, and identify all documents constituting the advice or opinion and/or referring or relating thereto.

**RESPONSE:**

In addition to its General Objections, Creative objects to this Interrogatory because it is vague and ambiguous. Neither Plaintiffs' Complaint nor these Interrogatories define the "'567 patent." Creative is therefore unable to answer this Interrogatory.

**INTERROGATORY NO. 5:**     Identify each and every factual and or legal conclusion that supports your allegation that neither Abraham nor Kramer are the inventors of the patented invention.

**RESPONSE:**

See Answer to Interrogatory no. 1.

**INTERROGATORY NO. 6:**     Identify the total amount of sales, in terms of units and dollars, that you have earned for the sale of your Product.

**RESPONSE:**

Subject to, and without waiving, its General Objections, zero.

**INTERROGATORY NO. 7:**     Identify the total amount of dollars you have spent to advertise, market or otherwise promote the Product. (This request includes, but is not limited to, all expenditures attributable to the creation, development, evaluation, approv-al, modification, and dissemination of promotional materials.).

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

LAW OFFICES OF THOMAS DEGROOT, LLC
7733 FORSYTH BLVD, Suite 1100
ST. LOUIS, MO 63105
(314) 812-2668

**RESPONSE:**

Subject to, and without waiving, its General Objections, zero.

**INTERROGATORY NO. 8:**    Identify those people to which you disseminated your advertisement of the Product.

**RESPONSE:**

Subject to, and without waiving, its General Objections, on September 22, 2011, Creative sent emails with a DIACtive sales sheet to the following companies:  Molecular Nutrition, BSN, SANN, Dymatize, Zerohalo, USP Labs, and ThermoLife.

**INTERROGATORY NO. 9:**    Identify any product that you sold or advertised for the sale that included 3,3' diiodothyroacetic acid or 3,5 diiodothyroacetic acid.

**RESPONSE:**

In addition to its General Objections, Creative objects to this Interrogatory because it is vague and ambiguous since the term "advertised" is undefined.  Subject to, and without waiving any of its objections, Creative has not sold any product that included 3,3' diiodothyroacetic acid or 3,5 diiodothyroacetic acid.  Creative never generally advertised for sale any product that included 3,3' diiodothyroacetic acid or 3,5 diiodothy-roacetic acid.  On September 22, 2011, Creative sent a limited promotional message to the seven entities identified in the last interrogatory answer.

**INTERROGATORY NO. 10:**    Identify any product that you purchased that included 3,3' diiodothyroacetic acid or 3,5 diiodothyroacetic acid.

**RESPONSE:**

Subject to, and without waiving, its General Objections, none

### VERIFICATION

Comes Now, Corey McNeely, General Manager of Creative Compounds, LLC, and being first duly sworn, does state the answers provided herein are, to the best of his knowledge, true and accurate.

_____
~~Corey McNeely~~

STATE OF MISSOURI

COUNTY OF CAPE GIRARDEAU

Sworn to and subscribed before me this _____ day of July, 2012, by and on behalf of Creative Compounds, LLC, who is personally known to me.

_____
Notary Public

Print Name:

My Commission Expires:

Dated: July 5, 2012

Thomas J. DeGroot (admitted *pro hac vice*)
LAW OFFICES OF THOMAS DEGROOT, LLC
7733 Forsyth Blvd.
Suite 1100
Saint Louis, MO 63105
314-812-2668
314-296-6001 (fax)
tom@degrootlaw.com
Attorney for Creative Compounds. LLC

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the forgoing Answers to Interrogatories on Plaintiffs Defendant by first class mail, postage pre-paid, this 5th day of July, 2012 on:

Gregory B. Collins (#023158)
Jenessa G. B. Coccaro (#027090)
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com
jbc@kflawaz.com
Counsel for Defendant

By: _____
Attorney for Creative Compounds. LLC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT INFRINGEMENT**

Exhibit 7 – D. Cornelius Deposition taken on 2/7/13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

RON KRAMER, an Arizona   )
resident; SAL ABRAHAM, a)
Florida resident;       )
THERMOLIFE INTERNATIONAL)
LLC, an Arizona limited )
liability company,      )
                        )
         Plaintiffs,    )
                        )
            vs.         )Case No.
                        )2:11-cv-01965-PHX-JAT (Lead)
                        )2:11-cv-02033-PHX-JAT (Cons)
CREATIVE COMPOUNDS LLC, )
a Nevada limited        )
liability company,      )
                        )
         Defendant.     )
_____)
                        )
CREATIVE COMPOUNDS LLC  )
a Nevada limited        )
liability company,      )
                        )
         Plaintiff,     )
                        )
            vs.         )
                        )
RON KRAMER, an Arizona  )
resident; and SAL       )
ABRAHAM, a Florida      )
resident,               )
                        )
         Defendants.    )

DEPOSITION OF DEREK CORNELIUS
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
TAKEN ON BEHALF OF THE PLAINTIFFS
FEBRUARY 7, 2013
(Starting time of the deposition: 10:20 a.m.)

REPORTED BY:  JOANNA CHARLTON, RPR, CCR(MO), CSR(IL)
JOB NO. 174594-C

DEREK CORNELIUS - 2/7/2013

1    came to the Chaffee -- or Syntrax Innovations was

2    always located in Chaffee, which is about a half an

3    hour away.  The sample would've came directly to the

4    office and --

5         Q.  Who was it developed by?

6         A.  Well, I came up with the compound what I

7    wanted, and then Tabak -- I didn't come up with how

8    to synthesize it.  I mean, he's one of the few

9    companies in the world that's like an expert on the

10   chemistry.

11        Q.  Right.

12        A.  So I said this is what I'm looking for.

13   You come up with it.  You figure out how to make it.

14        Q.  Right.  So at some point you asked

15   Francisco Tabak and his company to synthesize I think

16   your word?

17        A.  Yes.

18        Q.  A sample of DIAC?

19        A.  Correct.

20        Q.  Okay.  What do you remember about that

21   discussion?

22        A.  I remember talking to him about

23   exclusivity.  There was an issue with the T2 that we

24   had, or it wasn't -- exclusivity wasn't specifically

25   discussed.  So there was a little bit of

DEREK CORNELIUS - 2/7/2013

1    misunderstanding. So I wanted to make sure that

2    didn't happen on this one, so I pretty quickly

3    brought that discussion up. Basically told him

4    something new that I had a good feeling about. Based

5    on the studies I think it can be a good product for

6    the U.S. market and wanted him to develop it. So I

7    pretty much probed and asked him his feelings on

8    exclusivity and if he thought he could make it and if

9    the price would be reasonable.

10         Q.  Okay. You indicated that based on the

11   studies you thought it would be a good product. What

12   studies were you looking at?

13         A.  I was using a database at the time. It

14    wasn't Pub Med. I don't remember even what it was

15    called, but it had -- I think it was chemical

16    abstracts or at least it contained that database

17    also. So I had that and stuff from Pub Med. It was

18    a very huge database. So I was just doing all my

19    research on that. There was quite a few. I mean,

20    there's not near as many on DIAC as TRIAC, but

21    there's quite a few studies on DIAC. Most of those

22    are in humans -- most of those are in animals, but

23    the studies I saw I felt like it was promising.

24         Q.  Do you remember any studies in humans?

25         A.  Off the top of my head I don't. I might

DEREK CORNELIUS - 2/7/2013

1    have come across some, but I don't remember all the

2    different studies and information that I looked at.

3         Q.  So you remember seeing these studies and

4    believing this was a product that would work in

5    humans; correct?

6         A.  Yes.

7         Q.  Was there anything -- as you sit here

8    today, do you remember anything that led you to

9    believe that specifically?

10        A.  Like, any specific study or anything?

11        Q.  Yeah.  Yes.

12        A.  No.

13        Q.  Okay.  So you asked Tolbiac and Tabak to

14    manufacture or synthesize DIAC for you?

15        A.  Correct.

16        Q.  Did you ask him for a specific quantity of

17    the DIAC?

18        A.  In terms of like a sample?

19        Q.  Yes.

20        A.  I don't remember if I actually asked him,

21    hey, look, I need this amount or if I just said I

22    need a sample.  I don't remember.  I know I asked him

23    for -- obviously I needed a sample because I needed

24    to experiment with and test it and that type of thing

25    to make sure it worked in humans and it was safe.

DEREK CORNELIUS - 2/7/2013

```
1              Q.   Okay.   Eventually you obtain a sample;
2         correct?
3              A.   Correct.   Yes.
4              Q.   What do you remember about that sample?
5              A.   The base main thing that I remember is that
6         it -- I don't know we even probably -- I think we
7         even call it like a sexy container or whatever, but
8         it was a very -- maybe not quite that long.
9              Q.   The length of a pen?
10             A.   Yeah.   But maybe a little shorter than
11        this, so I don't know four to five inches maybe and
12        maybe a little bit higher and thicker in diameter, so
13        maybe about half inch in diameter, maybe a little
14        less than half inch, and I believe it had a screw
15        top.   But it was just the whole thing was filled, so
16        I don't know how many grams.   It might have had --
17        you know, might have had 10, 15, 20 grams in it,
18        something like that.
19             Q.   This comes in a powder form?
20             A.   Yes, it was a white powder.
21             Q.   Can we call that a vial that it came in?
22             A.   Yes.
23             Q.   Do you remember if the vial had a label on
24        it?
25             A.   I believe it did.   I don't -- it's too long
```

DEREK CORNELIUS - 2/7/2013

1    ago to remember what it looked like.  It'd be very
2    rare for any product like that to not have a label on
3    it because, I mean.
4         Q.  You don't remember what the label said as
5    you sit here today; correct?
6         A.  I don't have a picture of it in my mind of
7    it saying DIAC, but, I mean, I know that was DIAC.
8         Q.  Okay.  How do you know it was DIAC?
9         A.  I don't believe -- I don't believe I tested
10   it in a third party.  So it would've been based on
11   the assurance of Tolbiac or Tabak.  Beyond that, all
12   the properties of it were what we would've considered
13   proper for DIAC, so.
14        Q.  Are you familiar with the properties of T2?
15        A.  I think so.
16        Q.  Okay.  Visually does T2 appear different
17   visually than DIAC?
18        A.  No.  It would look the same.
19        Q.  Okay.  They're --
20        A.  TRIAC, DIAC would be a white powder, yeah.
21        Q.  Okay.  Do you remember how many grams?  You
22   don't; right?
23            MR. DEGROOT:  I'll object to the form.
24        A.  I don't -- again, probably in the 10 to 20
25   gram range.

1          Q.   (BY MR. COLLINS)   After you obtained the
2     sample, what did you do?
3          A.   As with most new things, I mean, it was
4     pretty exciting getting this in.  It was TRIAC --
5     Triax was a fairly good seller for us, and this
6     was -- had a good opportunity or good chance of being
7     a replacement for it, and TRIAC, I mean, had a very
8     -- even a strong following in our office.  So people
9     were pretty excited when I got it in, quite a few
10    people.  I mean, it wasn't just me.  I didn't have it
11    in secret.  Other people in the office knew about it,
12    so, I mean, first thing we did -- first thing I did
13    is I tested on it myself.  I don't generally ask
14    anybody else before I tried it on myself to make sure
15    it was -- I felt like it was safe and had the right
16    properties.  So first thing I did was test it on
17    myself, and I did it for -- I think I tested it for,
18    like, four to six weeks, and the dosage was quite a
19    bit higher.  I started out with a dosage around
20    TRIAC.  I think I needed -- again this is a long time
21    ago, but I believe there needed to be around two to
22    three times the dosage to get something that was semi
23    equivalent at least to the TRIAC, so, you know, I
24    tested it for a while and made sure it had the proper
25    weight loss, didn't hurt the heart, that type of

DEREK CORNELIUS - 2/7/2013

1    thing.

2         Q.   Okay.  I want to unpack that.  I want to

3    unpack that whole answer and walk through it.

4         A.   Okay.

5         Q.   You said you obtained the sample, and you

6    began testing it on yourself?

7         A.   Correct.

8         Q.   Correct.  Did you test it on anybody else

9    at that point?

10        A.   When I was testing it?

11        Q.   When you tested it on yourself, did you

12   give it to somebody else at the same time?

13        A.   No.  The very first thing it was me.

14        Q.   Okay.  You received the sample.  You start

15   doing tests on yourself.  How many grams a day did

16   you take?

17        A.   It would be -- this is measured in

18   micrograms or milligrams.

19        Q.   Okay.

20        A.   So I don't remember exactly, but I think

21   the proper dose on that was in the three to five

22   milligram range per day.  I'm not a hundred percent

23   sure about that, but that's the best of my knowledge.

24   I didn't keep a journal of any of this, so I don't

25   have it to look at.

DEREK CORNELIUS - 2/7/2013

1      Q.  So you didn't keep a journal of any of the

2  tests on yourself; correct?

3      A.  Correct.

4      Q.  You eventually test it on other people;

5  correct?

6      A.  Correct.

7      Q.  Did you keep a journal of that information?

8      A.  No.  I mean, at the time -- a lot of times

9  if I was doing those tests I might just write it down

10  on a piece of paper or notebook or whatever, but it

11  wasn't anything that was formal that it was, you

12  know, filed it away or anything like that.

13      Q.  Okay.

14      A.  I wasn't trying to prove anything in a

15  research paper.  I wasn't publishing it.  This was

16  all marking purposes.  As long as it met our

17  requirement, that's all that mattered.

18      Q.  Okay.  You describe -- you described it

19  as -- you could keep it on a sheet of paper, notes on

20  a sheet of paper; right?

21      A.  Yeah, a lot of times I would do that.

22      Q.  Have you looked for that sheet of paper?

23      A.  It doesn't exist.

24      Q.  Okay.

25      A.  Not any more.

DEREK CORNELIUS - 2/7/2013

Page 54

1           Q.  You think you probably threw it away?

2           A.  Yes.

3           Q.  Any idea when that sheet of paper or other

4  papers related to this testing would've been lost or

5  thrown away?

6           A.  I have no idea.  Over the years -- honestly

7  I wouldn't have believed I needed that piece of paper

8  over the years until recently, so.

9           Q.  Okay.  All right.  So you start testing it

10  on yourself.  You're using you believe between three

11  to five milligrams a day; correct?

12          A.  Correct.

13          Q.  How many -- how many times a day would you

14  use it?

15          A.  Anywhere from two to three.

16          Q.  And you said three to five milligrams a

17  day, so you would take how much in each serving?

18          A.  Usually one to one and a half.

19          Q.  And you said you tested it on yourself for

20  four to six weeks?

21          A.  Somewhere in that range.  It was -- it

22  wasn't two weeks.  It could've been around a month

23  timeframe, somewhere in there.

24          Q.  Okay.  Did you adjust -- can we call that

25  the dosage?

1          A.   Yes, that's fine.

2          Q.   **Did you adjust the dose over this**

3     **timeframe?**

4          A.   Yes.   I started out with the TRIAC dosage,

5     which I believe is somewhere around a milligram a day

6     I believe, something like that.   It would've had to

7     have been adjusted upwards from there.   Again it's

8     not as strong as TRIAC, so when I took it I realized

9     that and moved the dosage up.

10         Q.   **Okay.   How did you -- how did you determine**

11    **that it wasn't as strong as TRIAC?**

12         A.   Couple of things.   With TRIAC one there is

13    some cardiac stimulation but not very much, but

14    they're still easily -- with your blood pressure and

15    stuff, there's a slight uptick, one.   Number two, you

16    can actually -- you can feel the TRIAC a little bit

17    stimulatory, and what is the third one?   What was I

18    going to say?   Give me a minute.   I just blanked out.

19         Q.   **No problem.**

20         A.   I don't know.   I can't remember what I was

21    going to say, but, I mean, it also because of the

22    weight loss and initially when I studied that it

23    would've caused weight loss in, like, two days, so

24    it's something that's more extended.   So, I mean, a

25    lot of it is just kind of a gut feeling.   So when I

1    took it I didn't feel nor did I see any of the
2    results that I would've normally seen on TRIAC.  I
3    started seeing those when I got up in the two to
4    three times the dosage.
5         Q.  When you say seen those, what do you mean
6    by that?  I mean, you're not actually seeing the
7    results; right?  You're feeling the difference?
8         A.  Well, we are measuring blood pressure.
9         Q.  Okay.
10        A.  Pulse rate and then, yeah, part of that is
11   also a feel, how do you feel.
12        Q.  What sort of tests were you doing on
13   yourself during this time?
14        A.  Like I said, the pulse, blood pressure, and
15   then during the whole month or so period also to see
16   if I did lose any weight.
17        Q.  How much did you weigh at that time?
18        A.  I believe probably in the 205 pound range.
19        Q.  How much do you weigh today?
20        A.  About 190.
21        Q.  Okay.  All right.  You said you would check
22   your pulse.  How often would you check your pulse
23   while you were testing DIAC on yourself?
24        A.  I don't remember exactly, but I believe
25   several times a day.

| | |
|---|---|
| 1 | Q.   And would you record that pulse reading |
| 2 | anywhere, the result anywhere? |
| 3 | A.   I don't know if I specifically wrote that |
| 4 | down or not.  There's a good chance I would've kind |
| 5 | of just again kept that on a piece of paper and wrote |
| 6 | it down just to kind of see where it was going every |
| 7 | time. |
| 8 | Q.   Okay.  Could you have kept just a -- could |
| 9 | you simply have just remembered what your pulse was? |
| 10 | A.   I mean, it's possible. |
| 11 | MR. DEGROOT:  Object to the form. |
| 12 | Q.   (BY MR. COLLINS)  Yeah.  Do you |
| 13 | specifically remember writing down what your pulse |
| 14 | was? |
| 15 | A.   No. |
| 16 | Q.   Okay.  So it's possible you might have just |
| 17 | remembered, hey, my pulse was 110 at 10 a.m. and |
| 18 | checked yourself at noon? |
| 19 | A.   It's possible.  Again -- |
| 20 | MR. DEGROOT:  Object to the form. |
| 21 | Q.   (BY MR. COLLINS)  Go ahead. |
| 22 | A.   It's possible. |
| 23 | Q.   Okay. |
| 24 | A.   I mean, I knew what my normal pulse rate |
| 25 | was, and over time I would've known it'd gone up. |

* CONFIDENTIAL *

DEREK CORNELIUS - 2/7/2013

```
 1      It's possible for that to happen also.
 2           Q.   Okay.  Would you check your pulse after you
 3      administered the DIAC to yourself?
 4           A.   It doesn't have that quite of a half-life.
 5      It would -- it would be throughout the day, so you
 6      wouldn't have to test it right after, but it would've
 7      been important to check it several times in the day
 8      to get a good average.
 9           Q.   And how often did you check your blood
10      pressure during this timeframe?
11           A.   I think that would've only been once a day.
12           Q.   Did you record the blood pressure reading
13      anywhere?
14           A.   Again, I have no knowledge.  I could have
15      but I'm not sure.
16           Q.   Okay.  And your weight did you check your
17      weight while you were using this product?
18           A.   Yes.
19           Q.   How often did you weigh yourself while
20      using this product?
21           A.   Every day but I still weigh myself every
22      day.
23           Q.   I do not.  So you would weigh yourself
24      probably once a day; right?
25           A.   Right.
```

* CONFIDENTIAL *

DEREK CORNELIUS - 2/7/2013

1          Q.   Okay.  Do you think you weighed yourself
2    more than once a day?
3          A.   I don't think there was any need to.
4          Q.   Do you know if you recorded your weight
5    every day?
6          A.   Same answer as before.  I'm not sure.
7          Q.   Okay.  So you recorded -- you remember
8    checking at least your pulse, blood pressure, and
9    weight on a daily basis or twice daily basis?
10         A.   Correct.
11         Q.   Or regularly --
12         A.   Correct.
13         Q.   -- during this test frame.  While you were
14    testing DIAC, what do you remember was the effect of
15    DIAC on your pulse rate?
16         A.   In the beginning nothing.  I believe the
17    dose was too low, at least that's my opinion.  When I
18    did get up into the two to three time range, then I
19    started to notice a slight uptick in the pulse rate,
20    which is what you should -- which is what I would've
21    -- I believe is what we were looking for actually.
22         Q.   Why is that what you were looking for?
23         A.   Because I'm comparing it to the TRIAC.  So
24    the TRIAC does that -- I mean, if you would've done
25    that with T3, T3 would raise it -- I mean, if you

DEREK CORNELIUS - 2/7/2013

1    took an excess of T3 you're going to get a vast

2    increase.  With the TRIAC, though, you'll still get a

3    very minor increase, so we were trying to duplicate

4    what we were seeing with the TRIAC.

5         Q.  Is the pulse increasing a sign that your

6    metabolic rate is increasing?

7         A.  Correct.

8         Q.  Okay.  And so one of the reasons that you

9    were looking to determine whether or not the pulse

10   rate increased was to determine if the metabolic rate

11   for an individual was increasing; correct?

12        A.  Correct.  Remember, it also has -- these

13   thyroid hormones have direction action on your heart,

14   so I was also looking at that also.

15        Q.  To check that?

16        A.  Yeah, I mean.

17        Q.  That unwanted side effect?

18        A.  Yeah.  I mean, if DIAC would've gone crazy

19   or whatever, then we would've said no.  It wouldn't

20   have been what we were looking for.

21        Q.  Okay.  How about blood pressure, what do

22   you remember were the results of the blood pressure

23   testing during this timeframe?

24        A.  It's hard to remember back.  I'm not sure I

25   remember blood pressure even going up.  I don't

* CONFIDENTIAL *

DEREK CORNELIUS - 2/7/2013

1    necessarily remember seeing anything happen with
2    blood pressure, which is not necessarily a normal,
3    you know.  I don't think that result was strange, but
4    I don't necessarily remember -- remembering any -- I
5    guess I don't have anything worth remembering
6    regarding blood pressure.
7         Q.  Okay.  How about weight, what effect did
8    you see on your weight during this timeframe?
9         A.  I remember every month period a couple of
10   pounds.
11        Q.  Okay.  You said a couple of pounds.  Do you
12   mean two pounds?
13        A.  I don't remember the exact, but it
14   wasn't -- I didn't lose ten pounds.  I remember
15   losing a few, so.
16        Q.  Okay.  So somewhere between one and --
17        A.  Yeah.  Maybe one and three or something
18   like that, you know.
19        Q.  Okay.  If you wanted to test somebody's fat
20   to muscle percentage, how would you do that?
21        A.  The easiest and the most common way is to
22   do skin fold measurements.  That would give you a
23   percentage of your body fat.  I guess indirectly
24   gives you what you want at the end of the day.
25   There's more scientific, more robust methods, of

DEREK CORNELIUS - 2/7/2013

1    doing so, but that one is the one that's commonly

2    used.

3         Q.   Okay.   The skin fold measurement do you

4    know if it's considered scientifically accurate?

5         A.   The more places on the body you take that

6    measurement the more accurate it becomes.   So there's

7    a formula for like I think three places, and there's

8    another one for five or eight or something like that.

9    I think the ones that take it in a lot of different

10   places I think are somewhat accurate.

11        Q.   Okay.   Do you know --

12        A.   Nothing like the ones that are -- the DEXA

13   measurements that are like really measuring things

14   directly.

15        Q.   You ever watch the NFL Combine?

16        A.   No.

17        Q.   You a football fan at all?

18        A.   No.

19        Q.   Okay.   The NFL Combine they have an

20   egg-type device that NFL football players get into,

21   and that device then comes out with a measurement.

22   Are you familiar with the process that I'm

23   discussing?

24        A.   Not by just the way you're describing it,

25   but --

* CONFIDENTIAL *

DEREK CORNELIUS - 2/7/2013

Page 63

1          Q.   Okay.  Are you familiar with other ways to
2    test the --
3          A.   Yes.
4          Q.   -- body to fat index?
5          A.   Yes.
6          Q.   What are some of the other ways?
7          A.   I think there's one called DEXA, D-E-X-A.
8    I don't know what it stands for.  There's another one
9    that uses bioimpedance.  There's another one that
10   uses -- I was just reading about it.  I can't
11   remember.  There's one I was just reading about, but
12   I can't remember how it works off the top of my head.
13            MR. DEGROOT:  Are we at a place we can take
14   a break?
15            MR. COLLINS:  Yeah.  Let me finish this one
16   line of questions.
17            MR. DEGROOT:  Sure.
18         Q.   (BY MR. COLLINS)  Did you do a skin fold
19   measurement test on yourself during this timeframe
20   while you were testing the product?
21         A.   No, I did not.
22         Q.   How about any of the other tests that we
23   just discussed?
24         A.   Did I do any of those?  No, I did not.
25         Q.   DEXA?

DEREK CORNELIUS - 2/7/2013

1          A.   No.

2          Q.   And the bioimpedance?

3          A.   Bioimpedance, no, I didn't.

4          Q.   You didn't do any of those.  So did you do

5     anything at all to test whether or not DIAC was

6     affecting lean body mass as opposed to fat tissue?

7          A.   That would've been subjective.  I will say

8     that TRIAC that was one of the big marketing pushes

9     that we did with TRIAC, and that is -- there's --

10    it's not directly said in the literature, but it was

11    something that we noticed that there was some

12    anti-catabolic of the TRIAC, so it actually protected

13    muscle tissue while fat loss.  So it's one of the

14    things we did with TRIAC.  We marketed the Triax for

15    protecting lean body mass, so obviously the DIAC we

16    would've been looking at those same type of things,

17    but, I mean, we never got to the point of marketing

18    the DIAC to the public in general, I mean, selling it

19    as a final product, so.  But, yeah, that was --

20    that's one of the properties of at least -- I don't

21    want to say all thyroid hormones, but at least the

22    TRIAC had that property.

23         Q.   Okay.  But you never tested DIAC to

24    determine if they had that property; correct?

25              MR. DEGROOT:  Are you talking about on

DEREK CORNELIUS - 2/7/2013

1    himself?

2         Q.   (BY MR. COLLINS)   I'm talking about on

3    yourself right now.

4         A.   On myself I did not except for subjective.

5    I felt like it was having the proper -- I felt like

6    what I was losing was fat.  I didn't feel like I was

7    losing all my muscle and I had all this fat, you

8    know, still dripping on me, you know.  So I felt like

9    it was having the proper, you know, but I did not

10   measure that to know a hundred percent.

11        Q.   Understood.  Okay.  Let's take a break.

12             (Break was taken.)

13        Q.   (BY MR. COLLINS)   Mr. Cornelius, we've been

14   discussing the four to six weeks after you received

15   the sample of DIAC in your testing of DIAC on

16   yourself; right?  During those four to six weeks

17   after you received the sample of DIAC, was DIAC

18   tested on anyone else other than yourself?

19        A.   Probably more like four weeks.  I'm

20   thinking about a month, but during that time it was

21   only myself.

22        Q.   Okay.  So after that time period, after

23   those four weeks, however long it was, was DIAC ever

24   tested on anyone else?

25        A.   Yes.

DEREK CORNELIUS - 2/7/2013

```
 1              Q.  Who was DIAC tested on?
 2              A.  I don't -- the best of my knowledge, we
 3       tested it on about four or five people.  They
 4       would've been -- they would've been employees of the
 5       company.  I don't remember everybody.  The only
 6       people -- the only two people I remember that tested
 7       it was a guy named Joey Rodriguez, and he was the
 8       sales manager at the time and then Brenda Nixon the
 9       other person.
10              Q.  Do you know somebody named Diana Javinous
11       last name --
12              A.  Javinous?
13              Q.  Yes.
14              A.  Yes, I know who she is.
15              Q.  Who was she?
16              A.  She was kind of like a receptionist/office.
17       She'd still do that.  She did a lot of different
18       things but like -- wasn't an office manager, but kind
19       of receptionist/office person, filing, typing, that
20       type of thing.
21              Q.  Do you know if DIAC was tested on her as
22       well?
23              A.  I'm not a hundred percent sure.  There's a
24       good possibility.  She tested -- she was one of the
25       testers for T2 when we were testing for the
```

1    Lipokinetix.  Again, I'm not a hundred percent sure,
2    but it's reasonable that she would've been.
3        Q.   Okay.  So how many people did you say you
4    tested it on?
5        A.   At least four if not five.
6        Q.   Okay.  Plus yourself?
7        A.   Right.
8        Q.   Okay.  With these individuals what was the
9    testing process?  How did you test it?
10       A.   It would've been different in me.  I
11   would've already determined the dosage.  They
12   would've been given the dosage.  Again, would've been
13   split up between two and three times.  Sometimes that
14   depends on how good the person is at taking that
15   dosage.  They would've taken it in the same
16   parameters, would've been looking at blood pressure,
17   heart rate, just to make sure in other people it was
18   okay and then ultimately, you know, make sure it was
19   fat loss that they were getting.
20       Q.   Those are the three things that you tested
21   in yourself; correct?
22       A.   Correct.
23       Q.   Okay.  Is there any test that you ran on
24   those individuals that you didn't run on yourself?
25       A.   I don't believe so.

1       Q.   Okay.

2       A.   And just anecdotal to overall how do you
3   feel, you know, all of that would've came into play,
4   too.   Are you feeling sick; are you feeling fine; are
5   you feeling good, you know.

6       Q.   With yourself you testified that you might
7   have kept notes on a scratch piece of paper regarding
8   those tests; right?

9       A.   Right.

10      Q.   With these individuals did you keep any
11  information regarding those tests?

12      A.   Again, I don't remember.

13      Q.   Did you ask them to keep a daily log?

14      A.   I don't believe I did.

15      Q.   Do you remember what the dosage was?

16      A.   It was -- I believe it would've been the
17  same as what I did, but I believe it was probably
18  around three milligrams.

19      Q.   And that was three milligrams a day or
20  three milligrams --

21      A.   Three milligrams a day.

22      Q.   A day?

23      A.   It could've been two, but I believe it was
24  around three.

25      Q.   And the sample that you received it was in

DEREK CORNELIUS - 2/7/2013

1    powder form; right?

2         A.   Correct.

3         Q.   Okay.  Was it put into capsules for these

4    people to test, or did they just take the powder

5    straight?

6         A.   We have done capsules in the past on some

7    products.  I believe this one would've just been the

8    powder I believe.  It's hard to distinguish between.

9    We've done capsule in a lot of different things.

10   Some things in the past we've put into capsules.

11   Some things we just did powder.  I believe this one

12   was just powder, though, but I'm not a hundred

13   percent sure.

14        Q.   Okay.  You believe this one was

15   administered in a powder form; right?

16        A.   Uh-huh.

17        Q.   How did you determine whether a person was

18   using three milligrams of the powder a day?

19        A.   It would've been given at the office.

20        Q.   Okay.  It would've been administered at the

21   office?

22        A.   Yes.

23        Q.   Okay.  Who would've administered it?

24        A.   Most of the time I would've been part of

25   that usually.

DEREK CORNELIUS - 2/7/2013

```
 1              Q.   Okay.
 2              A.   Part of that process.
 3              Q.   Is this a formal process?  People come
 4      knock on your door and say --
 5              A.   No.
 6              Q.   -- it's time for me to take my DIAC?
 7              A.   No.
 8              Q.   Okay.  How did it work?
 9              A.   Usually when I came in the morning, they
10      would get the first dose, and then if it was either
11      two or three times throughout the day or whatever
12      maybe after lunch or at the end of the day the same
13      thing would've occurred.  They would've gotten the
14      dosage.  Probably most people would've done two
15      versus three, but it's hard to remember all the
16      details back then.  But yeah, we would've just given
17      it out, and part of that process also would've been
18      looking at their blood pressure.  I mean, it would've
19      happened at the same time.
20              Q.   Did you have a chart set up in the office
21      to check people off as they received their dose each
22      day?
23              A.   I don't believe so.
24              Q.   Okay.  Did you ever let anybody take the
25      powder home to use at home?
```

DEREK CORNELIUS - 2/7/2013

Page 71

```
 1            A.   They would've had to do that on the
 2    weekends.  I don't remember how we did that, though.
 3    I don't know if we put it in capsules or if we gave
 4    it to them -- I don't remember how we did that.
 5            Q.   Okay.  You would've had to have sent some
 6    home with them at some point; right?
 7            A.   Right.  For the weekends, yeah.
 8            Q.   On the weekends, would you test these
 9    people daily?
10            A.   No.
11            Q.   Okay.
12            A.   They would just take it, and we would ask
13    them questions or whatever, get the information on
14    Monday.
15            Q.   Okay.  As you sit here today, do you
16    remember the results of the testing on these
17    individuals?
18            A.   I think it was -- from what I remember, it
19    was consistent with myself.  I think most people lost
20    -- I don't know.  Maybe somebody didn't lose much
21    weight, but for the most part, I think people lost a
22    small amount of weight and felt pretty good on it.
23    Blood pressure, pulse rate was within normal
24    reasonable range.  It was -- all of the testing,
25    everything that we did on it showed it to be
```

* CONFIDENTIAL *

1   something that was going to be a good replacement for

2   TRIAC.

3       Q.   Why do you say that?

4       A.   Because it had all the effects that we were

5   looking for, at least -- you know, we didn't give

6   this out to a thousand people because TRIAC was very

7   popular.  I don't know.  When you give it out to a

8   lot more people like that, you'll see things maybe

9   that you wouldn't see with a small amount, but in the

10  people that we tested, everything that we saw from

11  the research to our own tests showed that with the

12  higher dosage that we would get a lot of the same or

13  majority of the same effects as the TRIAC.

14      Q.   Okay.  Do you remember how much -- you said

15  you remember people losing weight; correct?

16      A.   Correct.

17      Q.   Okay.  Do you remember anyone in particular

18  that lost weight?

19      A.   Well, I remember Joey Rodriguez was always

20  very interested in it.  I mean, he was fascinated by

21  that.  I don't know if it was the vial that we had or

22  what.  We had some kind of show, a body building show

23  in that timeframe, so he was taking that in

24  preparation for a show so.  Again, he was dieting and

25  stuff, so I can't say all that weight loss was that,

DEREK CORNELIUS - 2/7/2013

 1      but I think he placed pretty good.  It was a body
 2      building show.  He was very lean, and I think it did
 3      pretty well for him.
 4          Q.  Did you make any efforts to determine
 5      whether or not Mr. Rodriguez's weight loss was
 6      directly attributed to DIAC as opposed to something
 7      else?
 8          A.  No.  It was just all -- most of what we did
 9      was subjective.
10          Q.  How about Brenda Nixon, do you know if she
11      lost weight?
12          A.  Yes.  I don't remember how much, but she
13      lost a pretty good amount of weight on it.
14          Q.  Did you make any efforts to determine
15      whether or not Mrs. Nixon lost weight directly as a
16      result of the DIAC as opposed to something else?
17          A.  No.  I think it's very difficult in any
18      situation like that to know, I mean.
19          Q.  You didn't monitor their diets; right?
20          A.  No.  I wasn't -- these are people that we
21      were close to and knew what we were trying to
22      accomplish, so, I mean, they knew their body.  I
23      mean, somebody that says, hey, look, this did well
24      for me, you know, that's what I need to hear in order
25      to know it's something we need to market or not, so.

DEREK CORNELIUS - 2/7/2013

```
 1              Q.  So a lot of this is subjective; right?
 2         A.  Yes.
 3              Q.  A lot of this is anecdotal?
 4         A.  Yes.
 5              Q.  How about yourself, did you monitor your
 6    diet while you were testing the product on yourself?
 7         A.  I attempted to keep everything the same.
 8    I'm pretty strict about my diet.  I eat breakfast,
 9    eat kind of the same kind of thing for my breakfast,
10    lunch.  My wife always cooks.  I eat the same amount
11    for dinner.  I've been doing that for years, so that
12    would've been kept the same for me.
13              Q.  Okay.  But you didn't make any efforts to
14    determine whether or not the DIAC was actually the
15    cause of your weight loss as opposed to something
16    else; correct?
17         A.  Correct.
18              Q.  Okay.  The testing on the four to five
19    people other than yourself this testing that occurred
20    after you took it for a test period how long did
21    that -- how long did these people take the product?
22         A.  I'm going to say most of them probably took
23    it in the four to six week timeframe.  Joey might
24    have taken it longer because of the show that he had,
25    but I'm not sure.  But I don't think any of them were
```

```
 1      on it for, like, three months or anything like that,
 2      so I think four to eight weeks would probably be the
 3      minimum and maximum.
 4           Q.  Okay.  The four to five people that tested
 5      the product they were all Creative Compounds, or were
 6      they were all Syntrax --
 7           A.  Syntrax.
 8           Q.  -- employees?
 9           A.  Yes.
10           Q.  Was there anyone who wasn't a Syntrax
11      employee that used the product during this time
12      period?
13           A.  I don't believe so.
14           Q.  Okay.  Did you ever publish the results of
15      this test?
16           A.  Written like written published, no.
17           Q.  Okay.  Did you ever discuss it on an
18      internet message board?
19           A.  I do believe I did that.  We don't have it
20      now or none of the other companies I'm associated
21      with, but Syntrax Innovations I had a forum,
22      discussion board, or whatever.  And I believe it's
23      something that I discussed because a lot of people
24      were interested.  Hey, what are you coming out with?
25      We actually came out with a replacement for the TRIAC
```

1      called Triax 2, but it didn't have -- it wasn't a
2      thyroid hormone, and so people weren't so satisfied
3      with the replacement.  Even though I think it still
4      had good decent fat burning, it did not provide --
5      the TRIAC was fairly dramatic.  I mean, for a
6      supplement it was -- maybe because it was hormonal --
7      fairly dramatic in its effects, so people wanted that
8      same type of thing again.  So a lot of people were
9      really interested in what was next and is there a
10     replacement, so the forum or the board would've been
11     something -- that's a place where I would've
12     discussed that.
13          Q.   Okay.
14          A.   The DIAC.
15          Q.   As you sit here today, do you remember
16     discussing it on the forum or the message board?
17          A.   The best of my belief is that I did.
18          Q.   Okay.  And I used the word forum and
19     message board interchangeably.
20          A.   Me, too.
21          Q.   Okay.  How did the Syntrax forum or message
22     board work?
23          A.   I guess like most of them.  It wasn't a
24     chat room or anything like that.  It was -- you could
25     start a new thread, and then people could respond to

1     that thread.  Or you could -- or you could respond to
2     a thread, so and everything -- you know, you could
3     type it out and hit send or whatever, and it would
4     go.  It would -- I don't know how you would say it.
5          Q.  It would be --
6          A.  It would be like a note format, you know.
7          Q.  Okay.  Were there moderators on the forum
8     or message board?
9          A.  No.
10         Q.  Okay.
11         A.  That would -- we didn't really do any
12    moderating.  I guess you could say I did, but we
13    didn't have a habit of deleting stuff.  We pretty
14    much kept it free and let people say what they wanted
15    to say.
16         Q.  Did people have to sign up for an account
17    in order to boast on the message board?
18         A.  I don't think so.
19         Q.  Okay.  Did you have a screen name on the
20    message board?
21         A.  I did, but I don't remember what it was
22    now.
23         Q.  Okay.  Do you know if Syntrax's message
24    board is still operating?
25         A.  It is not.

DEREK CORNELIUS - 2/7/2013

```
 1              Q.   If you wanted to try to obtain posts from
 2      that message board today, how would you do that?
 3              A.   I have no idea.  None of that information
 4      would've been kept.  That website is -- no parts of
 5      that website are around anymore as far as I know.
 6              Q.   Do you know what an internet service
 7      provider is?
 8              A.   Yes.
 9              Q.   Do you know who Syntrax's internet service
10      is provider was?
11              A.   No.
12              Q.   If you wanted to know who Syntrax's
13      internet service provider was, who would you ask?
14              A.   Hakan, which is the IT department, he would
15      be the only other person that possibly would know.
16              Q.   Hakan?
17              A.   H-A-K-A-N, Hakan.
18              Q.   Is that a fist name or last name?
19              A.   First name.
20              Q.   Do you know what his last name is?
21              A.   Atilgan, A-T-I-L-G-A-N.
22              Q.   Do you remember what the website was for
23      Syntrax?
24              A.   Yeah.  I think it was syntrax.com,
25      www.syntrax.com.  Then SI03 took over that.
```

1    been, like, 10,000 bucks. So the last thing as a
2    small spend you want to do is spend $10,000 on
3    something that doesn't look like it's going to go
4    where you want it to go in terms of marketing, so we
5    made a decision along the way that DIAC is probably
6    not where we want to go as a company, and so pretty
7    much all plans regarding any kind of patents or
8    anything like that died at that time.
9        Q.   Okay.  Did you ever call an attorney
10    regarding applying for a patent for DIAC?
11        A.   I don't think with DIAC.  At some point
12    probably earlier than that for something else
13    whatever I had probably called about something.  I
14    knew it was around $10,000.
15        Q.   Okay.  But that conversation one related to
16    DIAC?
17        A.   No, no.
18        Q.   Okay.  You said that -- I'm sorry, I keep
19    screwing up the name of this company, Syntrax?
20        A.   Right.
21        Q.   Made a decision not to go in this direction
22    toward DIAC.  Why not?
23        A.   I was -- it had to do with the TRIAC, so
24    the -- you know, there was a disagreement with the
25    government with the FDA over this being a dietary

DEREK CORNELIUS - 2/7/2013

```
 1     and is your upside down?
 2          Q.   (BY MR. COLLINS)  Oh, I might have stapled
 3     one of them wrong at least.  Does yours have a page
 4     that's upside down?
 5          A.   No.
 6               MR. DEGROOT:  Okay.  Then don't worry about
 7     the lawyer.
 8          A.   I guess I'm ready to answer questions.
 9          Q.   (BY MR. COLLINS)  Okay.  Let's take a look
10     at claim one.
11          A.   Okay.
12          Q.   Claim one there reads a method of promoting
13     lean body mass in a human individual having a body
14     mass index of at least 25, comma, comprising directly
15     administering to the individual in effective amount
16     of DIAC.  Do you see that?
17          A.   Yes.
18          Q.   Okay.  In your testing of the DIAC that you
19     had, did you determine whether or not administering
20     DIAC to an individual having a body mass index of at
21     least 25 promoted lean body mass?
22          A.   No, I did not.
23          Q.   Okay.  Why were you unable to make that
24     determination?
25          A.   I don't know if I was unable to.  I don't
```

1    think it was something I was looking for.
2         Q.   Okay.  Do you know if any of the people you
3    tested DIAC on had a body mass index of at least 25?
4         A.   I don't know.
5         Q.   Okay.  Let's take a look at claim two.
6    There it states the method of claim one, comma,
7    wherein DIAC comprises one of 3,3' DIAC and 3,3 --
8    I'm sorry, 3,5 DIAC.  Do you see that?
9         A.   Yes.
10        Q.   Okay.  Did I read that accurately?
11        A.   Yes.
12        Q.   Okay.  Were you able to determine whether
13   or not administering 3,3' DIAC to an individual
14   having a lean body mass index of at least 25 promoted
15   lean --
16        A.   No.
17        Q.   -- body mass?
18        A.   We never looked at the 3,3' DIAC.
19        Q.   Okay.  In claim three, claim three reads
20   the method of claim one wherein DIAC is selected from
21   a group consisting of diiodothyroacetic acid isomers,
22   esters, salts, ethers thereof.  Do you see that?
23        A.   Yes.
24        Q.   In your testing were you able to determine
25   the effect of administering -- let me skip that one.

DEREK CORNELIUS - 2/7/2013

1       A.   Okay.

2       Q.   Let's take a look at claim six.

3       A.   Okay.

4       Q.   Claim six is the top of column two.  Do you

5  see it?

6       A.   Yes.

7       Q.   Okay.  It reads a method of increasing a

8  proportion of lean body mass to adipose tissue in a

9  human individual having a body mass index of at least

10  25, comma, comprising directly administering to the

11  individual an affective amount of DIAC.  Did I read

12  that accurately?

13       A.   Yes.

14       Q.   Okay.  In your testing, were you able to

15  determine whether or not DIAC promoted lean body

16  mass, the building of lean body mass to adipose

17  tissue, it promoted that ratio?

18       A.   I believe subjectively we were looking at

19  that, and we believed that the -- again, we were

20  looking for fat loss, not just weight loss, and so I

21  believe what we saw was a decrease in the adipose

22  tissue, which would've made the proportion higher.

23  That wasn't -- again, a lot of that was subjective.

24  It wasn't anything that we had numbers for.

25       Q.   Yeah.  To test that -- you testified that

1    that was a subjective result?

2         A.   Correct.

3         Q.   Is that the way to say it?

4         A.   Correct.

5         Q.   If you wanted to have an objective result

6    that tested that, how would you do that?

7         A.   I think you would have to take your body

8    weight then you would need to -- you can do some

9    complex stuff, but again I think you could do it if

10   you did a body fat caliper measurement you did that

11   in five and eight positions I think that would also

12   give you a reasonable scope of what it was doing.

13        Q.   Okay.  And why wasn't that done?  You just

14   didn't think of it?

15        A.   Well, I don't know that I couldn't have

16   thought about it.  It didn't seem pertinent at the

17   time to what we were trying to accomplish.  I didn't

18   feel like that was necessary.

19        Q.   Okay.  Let's skip down to claim eleven.

20   Claim eleven reads a dietary supplement comprising

21   DIAC.  Do you see that?

22        A.   Yes.

23        Q.   Okay.  In your testing, were you able to

24   determine whether or not DIAC was appropriate for use

25   as a dietary supplement?

DEREK CORNELIUS - 2/7/2013

1     A.   Yes.   In fact, that's what we were looking
2  to do with it.
3     Q.   Okay.   And we talked about your testing
4  earlier.   Given that testing, why do you believe DIAC
5  is appropriate for use as a dietary supplement?
6     A.   I felt like it meets the criteria of a
7  dietary supplement.   As far as I know, it doesn't
8  have an IND on it.   It's naturally occurring,
9  naturally occurring in the food supply.   It's
10  something that people have been consuming in meat
11  because there's small quantities of this in meat, and
12  on top of that, it was to the best of our ability
13  even to what we were able to look at safe.   And it
14  had proper -- of course it doesn't have to work to be
15  a dietary supplement.   There's a lot of stuff on the
16  market like that, but we thought it was a good
17  product because we believed it had good efficacy.
18     Q.   Okay.   So one of the reasons you believed
19  it was good for use as a dietary supplement was
20  because it had good efficacy?   It was effective?
21     A.   It was effective.   We thought it -- we
22  believed it'd be safe, and we believed it met the
23  requirements of what a dietary supplement regulatory
24  wise would be or should be.
25     Q.   Okay.   Why did you believe it would be

1    safe?

2        A.   Just based on my own and four or five

3    people that tried it, I mean, didn't see anything

4    negative.   The heart rate, the blood pressure all

5    seemed within reason, normal, and just didn't see

6    anything negative with it.

7        Q.   Are you familiar with ThermoLife

8    International, LLC?

9        A.   Somewhat.   I mean, I know -- I've never met

10   Ron.   I know he's the owner I guess of it, or at

11   least he runs it.   And I know some of their products.

12       Q.   Are you familiar with one of their products

13   called Dicana?

14       A.   I -- I don't know a lot about it.   I know

15   it's a product with DIAC in it.

16       Q.   Okay.   Did you ever contact ThermoLife

17   regarding its sale of Dicana?

18       A.   Me personally?

19       Q.   Yes.

20       A.   No.

21       Q.   Okay.   Did you ever direct anyone to

22   contact ThermoLife regarding its sale of Dicana?

23       A.   I don't believe so.

24       Q.   The patent that we just issued that is

25   Exhibit 3, when was the first time you learned that

1    put on a couple of pounds.  I mean, it really wasn't

2    the reason that people were using it.

3         Q.  Do you know what testing was done to

4    support that claim?

5         A.  All of that was kind of a direct

6    correlation of TRIAC.

7         Q.  Was testing done on TRIAC to support that

8    claim for TRIAC?

9         A.  Yeah, anecdotal.  We, you know, sold TRIAC

10   for like a year.  So we had a lot of people, doctors,

11   that were using it with their patients.  We had a lot

12   of feedback and data on that to understand that that

13   was the case.

14        Q.  But your company never commissioned a study

15   to be done by anyone?

16        A.  No.

17        Q.  This is all anecdotal?

18        A.  Right.

19        Q.  Five, reduces cholesterol and triglyceride

20   levels; do you see that?

21        A.  Yes.

22        Q.  What support did you have for that

23   statement?

24        A.  Nothing direct in terms of testing DIAC.  I

25   never tested that.  That is a common feature, not

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

*ThermoLife International LLC et al v. Creative Compounds*

Case No. 2:11-cv-01965-PHX-JAT (Lead)
Case No. 2:11-cv-02033-PHX-JAT (Cons)

**PLAINTIFFS' STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT ON DEFENDANT'S DECLARATORY
JUDGMENT COMPLAINT AND PLAINTIFFS' CLAIM FOR PATENT
INFRINGEMENT**

Exhibit 8 – Third Supplemental Disclosure

Gregory B. Collins (#023158)
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com

Attorneys for Plaintiffs Ron Kramer, Sal Abraham, and
ThermoLife International LLC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ron Kramer, an Arizona resident; Sal Abraham, a Florida resident; ThermoLife International LLC, an Arizona limited liability company, | Case No. 2:11-cv-01965-PHX-JAT (Lead) 2:11-cv-02033-PHX-JAT (Cons) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' THIRD SUPPLEMENTAL DISCLOSURE STATEMENT** |
| Creative Compounds LLC, a Nevada limited liability company, | |
| Defendant. | |
| Creative Compounds LLC, a Nevada limited liability company, | |
| Plaintiff, | |
| v. | |
| Ron Kramer, an Arizona resident; and Sal Abraham, a Florida resident, | |
| Defendants. | |

Plaintiffs Ron Kramer, Sal Abraham and ThermoLife International, LLC submit

their Third Supplemental Disclosure Statement pursuant to Rule 26 Fed. R. Civ. P.

**26(a)(iii) Plaintiffs' Computation of Each Category of Damages Claimed by the Disclosing Party**

Plaintiffs Ron Kramer, Sal Abraham and ThermoLife International, LLC

previously disclosed that they would seek to recover at a minimum a reasonable royalty

1

1  from any infringing sales made by the Defendant Creative Compounds and the costs of

2  any advertising campaign necessary to remedy the harm done by Defendants' conduct.

3  In discovery, Plaintiffs have discovered that although Defendants falsely advertised for

4  sale an infringing product, the Defendants never sold the advertised product. Further, the

5  testimony has been that the product at issue was only advertised to less than 10

6  companies.

7        As a result of these facts, which were purely in the possession and control of the

8  Defendants, the Plaintiffs have determined that they will not pursue recovery of a

9  reasonable royalty and/or the costs of and remedial advertising campaign. Nonetheless,

10  Plaintiffs will seek the costs of this suit and attorneys' fees pursuant to the applicable

11  statutes as well as a permanent injunction to bar Defendant's future infringement and/or

12  future false advertising.

14        **26(2)(A) Plaintiffs' Disclosure of Expert Testimony**

15        Plaintiff disclose that they intend to rely on the expert testimony of John A.

16  Budny, PhD, CMI. A copy of Mr. Bundy's expert report and its supporting documents is

17  attached hereto.

18        DATED this 22nd day of February, 2013.

19                          KERCSMAR & FELTUS PLLC

21        By *s/ Gregory B. Collins*
             Gregory B. Collins
22           6263 North Scottsdale Road, Suite 320
             Scottsdale, Arizona 85250
23           *Attorneys for Plaintiffs Ron Kramer, Sal Abraham,*
             *and ThermoLife International LLC*

Kercsmar & Feltus PLLC
6263 N. Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

2

1

## CERTIFICATE OF SERVICE

2

3      I certify that on February 22, 2013, I served the original of this document by regular

      mail to the following:

4

      Thomas DeGroot
5      THOMAS DEGROOT, LLC
      Two CityPlace Drive
6      Suite 200
      Saint Louis, MO  63141
7      *Attorney for Defendant*
      *Creative Compounds, LLC*

8

      Maria Crimi Speth
9      Adam S. Kunz
      JABURG & WILK, P.C.
10     3200 N. Central Avenue, Suite 2000
      Phoenix, Arizona 85012
11     *Attorneys for Creative Compounds, LLC*

12

13      *s/Gregory B. Collins*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kersmar & Feltus PLLC
6263 N. Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
(480) 421-1001

3