**Thomas DeGroot (admitted *pro hac*)**
**LAW OFFICES OF THOMAS DEGROOT, LLC**
**7733 Forsyth Blvd.**
**Suite 1100**
**Saint Louis, MO 63105**
**Telephone: (314) 296-6070**
**Facsimile: (314) 296-6001**
**tom@degrootlaw.net**

**Maria Crimi Speth**
**Adam S. Kunz**
**Jaburg & Wilk, P.C.**
**3200 N. Central Ave., Suite 2000**
**Phoenix, AZ 85012**

**Attorneys for Defendant Creative Compounds, LLC**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ron Kramer, an Arizona resident; Sal Abraham, a Florida resident; ThermoLife International LLC, an Arizona limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>Creative Compounds LLC, a Nevada limited liability company,<br><br>Defendant. | Case No. 2:11-cv-1965-PHX-JAT (Lead)<br>2:11-cv-2033-PHX-JAT (Cons)<br><br>**DEFENDANT CREATIVE COMPOUNDS LLC'S COMBINED REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE INVALIDITY OF PLAINTIFFS' PATENT AND RESPONSE TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON CREATIVE'S DEFENSE OF INVALIDITY PURSUANT TO §§ 102(a) AND (b).** |
| Creative Compounds LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Ron Kramer, an Arizona resident; and Sal Abraham, a Florida resident,<br><br>Defendants. | |

Defendant Creative Compounds, LLC ("Creative") has moved for summary judgment on the invalidity of claim 11 of Plaintiffs' '533 Patent because the undisputed

1

evidence clearly and convincingly demonstrates that (1) the claimed invention was publicly known or used by others in this country before its invention by Plaintiffs, and (2) the invention was offered for sale in this country more than one year prior to the date of Plaintiffs' patent application.[1]  In their Response to Creative's Summary Judgment Motion and Cross-Motion for Summary Judgment on Creative's Invalidity Defenses Pursuant to §§ 102(a) and (b) ("Plaintiff's Response"),[2] Plaintiffs improperly attempt to graft additional limitations on to Claim 11 so they can argue that Cornelius did not reduce to practice the claimed invention.

### I.   CORNELIUS REDUCED TO PRACTICE THE INVENTION CLAIMED BY CLAIM 11 OF THE '533 PATENT.

"It is a 'bedrock principle' of patent law that 'the **claims** of a patent **define** the **invention** to which the patentee is entitled the right to exclude.'" "[W]e look to the words of the **claims** themselves . . . to **define** the scope of the patented **invention**." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal citations omitted)(emphasis original).  Further, the words of a claim are generally given the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id* at 1312-1313.  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Id* at 1313.  Phillips teaches that "the specification is 'the single best guide to the meaning of a patent

---

[1] Plaintiffs' complaint that Creative has advanced new defenses is untrue.  Plaintiffs have long known of these defenses.  *See* Dk. 56, at pp. 6-7.

[2] Plaintiffs' Response operates as its second motion for summary judgment in this matter, made without obtaining leave to file it, and in complete disregard of the Court's Case Management Order.  *See* Dk. 22, at p. 4.

Law Offices of Thomas DeGroot, LLC
7733 Forsyth Blvd., Suite 1100
Saint Louis, MO 63105
(314) 296-6070

term,' and that the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id* at 1321 (citations omitted). "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Id*. It is also long been recognized that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. *Id* at 1316 (citations omitted). "The inventor's written description of the invention, for example, is relevant and controlling insofar as it provides clear **lexicography"** *Thorner v. Sony Computer Entertainment America, LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012).

Plaintiffs' defense to Creative's Summary Judgment Motion centers on their argument that Creative failed to show that Cornelius had reduced the invention to practice.

Claim 11 is very concise. It reads:

A dietary supplement comprising diiodothyroacetic acid.[3]

Plaintiffs acted as their own lexicographers by defining "dietary supplement" when they stated: [DIAC] is a direct naturally occurring metabolite of T3, Triac, and T2, which has never been investigated or sold as a new drug therefore it may be sold as a dietary supplement." *See* Exhibit F, at col. 3, lines 28-31. Unlike the method claims in the '533 Patent,[4] while Plaintiffs might want to pretend otherwise, Claim 11 does not confine its

---

[3] The term diiodothyroacetic acid is hereafter referred to as "DIAC."
[4] *See* Exhibit F, at col. 5, lines 17-18; col. 6, lines 1-2. Exhibits referenced herein are attached to Creative's Statement of Undisputed Facts in Support of Its Motion for

3

claimed invention to a dietary supplement comprising DIAC used for promoting lean muscle mass or increasing the proportion of lean muscle mass to adipose tissue. Under the doctrine of claim differentiation there is a presumption that independent claims have different scope when different words or phrases are used in those claims. *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368-1369 (Fed. Cir. 2005). Furthermore, although the specification speaks almost entirely of using DIAC to promote lean muscle tissue or increasing the proportion of lean muscle mass to adipose tissue, the Court cannot import those limitations into Claim 11. *See Abbot Laboratories v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). Claim 11 is a simple composition patent.

Plaintiffs admit that in late 2000 or early 2001, Syntrax[5] received a sample of DIAC from Francisco Tabak and his company, Tolbiac S.R.L. *See* Dk. 58, at p. 8, par. 13. It is undisputed that DIAC had never been investigated or sold as a new drug, as the patent teaches. Thus, as soon as Cornelius obtained DIAC from Tabak, it is undisputed that Syntrax and Derek Cornelius possessed an embodiment that meets every limitation of Claim 11 of the '533 Patent.

Plaintiffs' definition of the term "dietary supplement" appears to be part of a definition for "dietary supplement" used in the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), 21 U.S.C. § 321 *et seq*. DSHEA refers, *inter alia*, to minerals, amino acids, and metabolites thereof. *See* 21 U.S.C. § 321 (ff)(1). Further, the same definition excludes ingredients sold as a new drug or authorized for investigation as a new

---

Summary Judgment On Invalidity.
[5] Cornelius owned Syntrax. Dk. 58, at p. 2. For purposes of this brief, reference to one refers to both.

4

drug from qualifying as dietary supplements. *See* 21 U.S.C. § 321 (ff)(3). But, any attempt by Plaintiffs to claim that, as used in the patent, the meaning of the term "dietary supplement" incorporates all the limitations commensurate with the term as defined in DSHEA would be without merit.

First, reference to DSHEA to define "dietary supplement," as used in the Patent, would be impermissible use of extrinsic evidence. Secondly, the second part of DSHEA's definition of "dietary supplement" includes, among things, a requirement that the product "is labeled as a dietary supplement." See 21 U.S.C § 321 (ff)(2). The goals of the patent system are (1) to foster and reward invention, (2) to stimulate further innovation, and (3) to insure free use of ideas in the public domain. *Caterpillar, Inc., v. Esco Corporation*, 2012 WL 253293, *8 (C.D. Ill.) (citations omitted). There is nothing innovative or inventive about slapping a label onto the packaging for a product, especially one that is required by law. Indeed, to import into the definition of "dietary supplement" the complete statutory definition under DSHEA, with its requirement that the product bears a label stating "dietary supplement" raises two insurmountable problems for the Plaintiffs.

1. While Plaintiffs referenced marketing brochures and emails to customers, nowhere in their Statement of Undisputed Material Facts or in their Memorandum in Support of their Motion for Summary Judgment for infringement did Plaintiffs (who have the burden of proof on that issue) state that Creative offered for sale a product with a label attached to it bearing the words "dietary supplement." They did not do so for a simple reason. Plaintiffs lose their infringement claim as a matter of law because Creative never had any product that had a label on it with the words dietary supplement. In fact, if

Plaintiffs now claim that a product must be labeled as a "dietary supplement," Creative withdraws its concession regarding infringement because Plaintiff has failed to prove (and did not even raise) a critical fact on which it had the burden of proof: that Creative had products that bore a label with the words "dietary supplement" on it.

2. Construction of the term "dietary supplement" in Claim 11 to include all the details of the statutory definition in DSHEA has the practical effect of rendering Claim 11 essentially meaningless because, to avoid the patent, all someone would have to do is put DIAC in a bottle, but not put the words "dietary supplement" on the bottle. Claim construction should not lead to such absurd results.

Plaintiffs misstate what is necessary for a reduction to practice of the invention claimed by Claim 11 of the '533 Patent. Repeatedly in their Response to Creative's Statement of Undisputed Facts, they dispute that Tabak or Cornelius ever reduced anything to practice with regards to DIAC. Tellingly, they claim that "[t]he sale of a component of a dietary supplement is not material to Creative's claim for invalidation." *See* Dk. 58, at p. 6, Response to par. 9 of Creative's Statement of Undisputed Facts. But DIAC is no component of a dietary supplement. Standing alone, it meets the definition of a dietary supplement.

Plaintiffs also argue that Cornelius did not reduce to practice the claimed invention because Creative supposedly failed to prove that Cornelius had performed tests sufficient to show that DIAC worked to promote weight loss or lean muscle mass. *See* Dk. 57, at p. 11. Plaintiffs' argument, even if true (and it is not) is a diversion because nothing in Claim 11 requires any such characteristics of DIAC, or even any health benefits at all. All

that Claim 11 requires is that Cornelius had possession of the physical embodiment of DIAC, which Plaintiffs admit they did.  Once Cornelius had possession of DIAC, by the terms of the Patent, it qualified as a dietary supplement, and necessarily met all the limitations of Claim 11.

Even if Cornelius was required to know that DIAC would work to promote lean muscle mass or promote weight loss (two different benefits), the record clearly establishes that he did.  Plaintiffs admit that Syntrax marketed Triax, a nutritional supplement in the fat-burning category that contained triiodothyroacetic acid ("TRIAC"), a metabolite of T3, and that Syntrax marketed Triax for protecting lean body mass while promoting fat loss.  *See* Dk. 58, at pp. 2-3, Response to par. 2 of Creative's Statement of Undisputed Facts.

Plaintiffs further admit that as part of his initial research on TRIAC, or in looking for a suitable replacement for TRIAC, Cornelius became familiar with DIAC.  *See* Dk. 58, at p. 4, Response to par. 5 of Creative's Statement of Undisputed Facts.  In fact, Cornelius testified that he laid out every possible naturally occurring compound that had thyroid hormone activity, and the effects on humans of a variety of thyroid hormones and their metabolites, including T3, T4, T2, TRIAC, and DIAC.  *See* Exhibit A, at 42:23-45:13.  Indeed, Cornelius testified that the "purpose of DIAC was to find something that was equivalent to the TRIAC at least--it wouldn't have been equivalent in terms of potency.  It was less--it was not as strong, but something that was as safe and could be sold as a standalone product." *See* Exhibit A, at 44:6-11.

Ironically, Plaintiffs themselves nowhere disclosed in the '533 Patent any test results, or any tests at all, to support their proposition that DIAC shifts the proportion

between lean body mass and adipose tissue in favor of lean body mass in humans. Instead, Plaintiffs merely cited various research papers, all published prior to 1991, and then concluded that "[a]fter an extensive review of the scientific literature and previous patents regarding the ability of diiodothyroacetic acid to alter body composition, it then became the focus of this invention that all isomers, esters, salts, ethers, metabolites, and analogs of diiodothyroacetic acid could be administered perorally as an effective way to shift the proportion between lean body mass and adipose tissue in favor of lean body mass in humans. *See* Exhibit F, at col. 5, lines 1-8. In other words, Plaintiffs did exactly what Cornelius did; they reviewed literature regarding the effects of DIAC. Cornelius, with a degree in biology, would have understood, and indeed by his testimony has shown that he did understand, from his own review of published materials what effects DIAC had on humans--that while not as potent as TRIAC, it could replace Triax (which contained TRIAC) to protect lean muscle mass while promoting weight loss. Thus, even if Creative is required to show that Claim 11 required knowledge of specific health benefits to humans by the consumption of DIAC (and it is not), Creative has shown that Cornelius, in fact, knew about those benefits before he even obtained DIAC from Tabak.

Plaintiffs further claim that the testing performed by Cornelius and others were inconclusive about whether DIAC promoted weight loss or promoted lean muscle mass. Plaintiffs, however, misapprehend the purpose behind the tests Cornelius and others undertook.

To lawfully market a dietary supplement containing a new dietary ingredient (which DIAC was), one of the ways the Federal, Food, Drug, and Cosmetic Act allows

anyone to actually sell it is for them to prove a history of use or evidence to establish that it is reasonably expected to be safe. *See* 21 U.S.C. 350b.[6] Cornelius already knew from his prior research that DIAC would promote weight loss and protect lean muscle mass. He ran tests on DIAC for two principle reasons: to determine the dosage that made a person feel the same way as when they had taken Triax, and to determine the safety of the product, especially with respect to any cardiovascular effects. *See* Exhibit A, at 51:1-52:1; 60:8-20. This is corroborated by Brenda Nixon. *See* Exhibit E, at 14:19-15:17. Thus, Plaintiffs' argument that Cornelius had not reduced to practice the invention claimed in Claim 11 of the '533 Patent because his test results on weight loss were inconclusive presents a meaningless diversion and is without merit. The tests run by Cornelius, which, in fact, also demonstrated weight loss (*see* Exhibit A, at 52:5-61:18, 65:13-72:13), principally dealt with safety issues and how people felt when taking DIAC, all of which Cornelius would have needed to lawfully market the product.

The only invention that Claim 11 of the '533 Patent claims is a dietary supplement comprising diiodothyroacetic acid. Plaintiffs have admitted that Cornelius had possession of DIAC no later than early 2001, long before Plaintiffs' claimed invention of it. In their patent, they admit that DIAC had never been investigated or sold as a drug; hence it qualified as a dietary supplement. Thus, when Cornelius took possession of the DIAC, he had the dietary supplement claimed by Claim 11. For that reason alone, Creative has clearly and convincingly demonstrated that Cornelius reduced to practice the invention

---

[6] Cornelius is presumed to know this law. Indeed, all persons are presumed to know the law and are charged with knowledge of provisions of statutes. *N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283 (1925).

claimed by Claim 11 of the '533 Patent. Furthermore, even if a reduction to practice of the invention claimed by Claim 11 of the '533 Patent required knowledge that DIAC would work to promote lean muscle mass or weight loss (and it does not), Creative has indisputably established that Cornelius already had such knowledge when he took possession of DIAC from Tabak. Finally, Plaintiffs' attack on Cornelius' test results is misplaced because those tests were principally directed to meeting the criteria of a different statute requiring demonstration of the product's safety.

## II.  MORE THAN ONE YEAR BEFORE PLAINTIFFS FILED THEIR PATENT APPLICATION, THE CLAIMED INVENTION HAD BEEN OFFERED FOR SALE IN THIS COUNTRY.

Plaintiffs filed the application that resulted in the '533 Patent on October 20, 2004. *See* Exhibit F, p. 1. Thus, the critical date for the on-sale bar contained in § 102(b) is prior to October 20, 2003. Plaintiffs do not dispute that a single offer to sell is sufficient to trigger the statutory bar or that an offer to sell made by a foreign company directed to a person located in this country constitutes an offer to sell that falls within the on-sale bar. *See In re Terazosin Hydrochloride Antitrust Litigation*, 352 F.Supp.2d 1279, 1304 (S.D. Fla. 2005); *In re Caveney*, 761 F.2d 671, 676-677 (Fed. Cir. 1985). Indeed, nowhere in Plaintiffs' Response do Plaintiffs even argue that DIAC was not the subject of a commercial offer. Instead, Plaintiffs rely solely on their argument that Cornelius had not reduced the invention to practice. As shown above, that argument is without merit.

Plaintiffs admit that in the fall of 2000, Cornelius and Tabak discussed sourcing DIAC from Tabak and that the price for DIAC would be similar to what Syntrax had been paying for T2 and TRIAC. *See* Dk. 58, at pp. 4-5, Response to par. 6 of Creative's

10

Statement of Undisputed Facts. Plaintiffs also admit that on October 24, 2000, Cornelius wrote Tabak and said that he "would like an exclusive on DIAC for nutritional purposes to be sold in the U.S." *See* Dk. 58, at p. 5, Response to par. 7 of Creative's Statement of Undisputed Facts. Plaintiffs desperately try to avoid also admitting that on October 25, 2000, Tabak offered to give Cornelius an exclusive for the supply of DIAC "restricted to Diac used for nutritional purposes in the U.S." by claiming that Exhibit C, the email making that offer, is inadmissible hearsay and has not been authenticated. Cornelius, however, authenticated the document as an email that he received from Tabak. *See* Exhibit A, at 160:14-21.

Under contract law, an "offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Rich Products Corp. v. Kemutec, Inc.*, 66 F.Supp.2d 937, 956 (E.D. Wis. 1999). Whether a communication constitutes an offer depends on the intention of the owner. *Id.* Exhibit C constitutes a statement by Tabak of his then existing state of mind; his intent or plan to supply DIAC to Syntrax on an exclusive basis on the conditions he lists. Pursuant to Fed. R. Evid. 803(3), his email of October 25, 2000 is not excluded by the rule against hearsay. It therefore stands as undisputed that Tabak offered to sell DIAC to Cornelius in the fall of 2000.

Plaintiffs' attempt to dispute Cornelius' understanding that Tabak's email constituted "an offering to basically sell this [DIAC] under these terms and with a price range that we talked about previously" and was an offer that Cornelius was willing to accept is nonsensical. First, they claim that neither Tabak nor Cornelius ever reduced

anything to practice with regards to DIAC. *See* Dk. 58, at p. 6, Response to par. 9 of Creative's Statement of Undisputed Facts. As shown above, however, this argument is without merit because Tabak did send to Cornelius a sample of DIAC, which by the the terms of the patent qualified as a dietary supplement.

Plaintiffs then claim that the sale of a component of a dietary supplement is not material to Creative's claim for invalidation. *See* Dk. 58, at p. 6, Response to par. 9 of Creative's Statement of Undisputed Facts. But, as shown above, the offer to sell DIAC was not merely an offer to sell a component of a dietary supplement; DIAC is, by itself, a dietary supplement.

Plaintiffs finally claim that Creative has no support for Tabak's intention regarding the sale. *See* Dk. 58, at p. 6, Response to par. 9 of Creative's Statement of Undisputed Facts. But, there is no requirement that Creative provide testimony from Tabak. Plaintiffs simply ignore Exhibit C, which itself evidences Tabak's intent. And, significantly, Plaintiffs point to nothing in the record to show that Tabak did not offer to sell DIAC to Cornelius in October 2000. Indeed, Plaintiffs' argument that Tabak did not offer to sell DIAC to Cornelius is disingenuous and moot because, separately, Plaintiffs admit that "[t]he evidence suggests that Tabak **sold** Cornelius a sample of DIAC . . ." *See* Dk. 57, p. 8. (emphasis added). That single sale is sufficient to trigger the statutory bar of § 102(b). *In re Terazosin Hydrochloride Antitrust Litigation*, 352 F.Supp.2d 1279, 1304 (S.D. Fla. 2005); *In re Caveney*, 761 F.2d 671, 676 (Fed. Cir. 1985).

Rule 56 requires that a party asserting that a fact is genuinely disputed either cite to particular parts of materials in the record, show that the materials cited do not establish the

12

absence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P 56 (c).  Here, Plaintiffs make no attempt to cite to particular parts of materials in the record.  Furthermore, Exhibits B and C, together with the cited testimony of Derek Cornelius, clearly demonstrate the absence of any dispute about Tabak's offer to sell DIAC for nutritional purposes to Cornelius.  And, Plaintiffs' objection to the admissibility of Exhibit C is, as discussed above, without merit.  Furthermore, even if Plaintiffs' objection to the admissibility of Exhibit C is sustained, it matters not.  Again, Plaintiffs separately admit that "[t]he evidence suggests that Tabak sold Cornelius a sample of DIAC . . ." *See* Dk. 57, p. 8.  That admitted sale alone suffices for Defendant's motion.

Creative has indisputably shown that the invention claimed in Claim 11 of the '533 Patent was offered for sale in this country in October 2000.  Further, Plaintiffs admit that Tabak sold Cornelius a sample of DIAC.  Both events occurred well more than one year prior to Plaintiffs' patent application.  Creative's motion for summary judgment that Claim 11 of the '533 Patent is invalid pursuant to § 102(b) should, therefore be granted.

### III.  CREATIVE HAS SHOWN THAT THE INVENTION CLAIMED IN CLAIM 11 OF THE '533 PATENT WAS PUBLICLY KNOWN OR USED IN THIS COUNTRY BEFORE THE INVENTION THEREOF BY PLAINTIFFS.

Plaintiffs attack Creative's assertion that Claim 11 of the '533 Patent is invalid under § 102 (a) in two ways.  First, they claim that Cornelius never reduced to practice the claimed invention.  As shown above, that argument is without merit.  Cornelius had possession of a physical embodiment of DIAC that had never been investigated or sold as a drug; it was a dietary supplement as used in Claim 11 of the '533 Patent.  Plaintiffs then

13

contend that Creative's evidence that it made publicly known the invention of DIAC as a dietary supplement lacks corroboration.

Plaintiffs' argument concerning corroboration is another red herring. Plaintiffs admit that in late 2000 or early 2001, Syntrax received a sample of DIAC from Francisco Tabak and his company, Tolbiac S.R.L. *See* Dk. 58, at p. 8, Response to par. 13 of Creative's Statement of Undisputed Facts. In fact, Plaintiffs unequivocally admit that "[t]he evidence suggests that Tabak sold Cornelius a sample of DIAC . . ." *See* Dk. 57, p. 8. Thus, it is undisputed that Syntrax and Derek Cornelius possessed an embodiment that meets every limitation of Claim 11 of the '533 Patent. In light of Plaintiffs' admission, there is no need for Creative to put forward any additional corroborating evidence on that point.

Furthermore, contrary to Plaintiffs' claim, Creative has produced sufficient undisputed and uncontradicted corroborating evidence that Cornelius and Syntrax publically used DIAC and also made public knowledge of use of DIAC as a dietary supplement. Plaintiffs attack solely the lack of any contemporaneous physical evidence. While Plaintiffs correctly note that oral testimony alone is viewed with skepticism, they overstate the law. First, it is only the inventor's testimony that requires corroboration. *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). And, while contemporaneous physical evidence is preferred, there is no strict rule that an inventor's testimony cannot be sufficiently corroborated by the testimony of others. Instead, "[a] 'rule of reason' analysis is applied to determine whether the inventor's prior conception testimony has been corroborated," and "there is no single formula that must be followed in proving

14

corroboration." *Id,* at 1195.  In fact, courts evaluate all the pertinent evidence to determine the sufficiency of corroboration.  As the court in *Price* stated:

> Factors bearing on the inventor's credibility and on whether the inventor's **testimony** has been adequately **corroborated** are (1) delay between the event and the trial, (2) interest of **corroborating** witnesses, (3) contradiction or impeachment, (4) **corroboration**, (5) the corroborating witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering the state of the art, (7) impact of the **invention** on the industry, and (8) relationship between witness and alleged prior user.

*Id*, at 1195, fn. 3 (emphasis original).

Cornelius testified about Syntrax' use of DIAC and its efforts to make publicly available information that DIAC was a dietary supplement that would replace TRIAC as a product for weight loss.  *See* Exhibit A, at 51:1-52:1; 75:4-76:17.  Creative has corroborated Cornelius' testimony that Syntrax used DIAC and made publicly known the use of DIAC as a dietary supplement through the testimony of Brenda Nixon.

Evaluated in light of the *Price* factors, Ms. Nixon's testimony suffices to corroborate Cornelius' testimony.

1. There has admittedly been a long delay between the event and her testimony.

2. Ms. Nixon is clearly a disinterested witness.  Indeed, she could actually be considered hostile to Cornelius because she left Syntrax in March 2001 due to a falling out with Cornelius.  *See* Exhibit E, at 19:8-12; 25:14-26:13.

3. There is no contradictory evidence or impeachment of Ms. Nixon.

4-5. Ms. Nixon thoroughly corroborates Cornelius' testimony about Syntrax's use of DIAC.  She is so familiar with the details because she used it herself, and because

15

she publicly disseminated information to the public, including customers and distributors. Ms. Nixon told distributors and customers that Syntrax was going to use DIAC to replace TRIAC. She recalled the names of specific customers with whom she had some of these discussions. She specifically used the term diiodothyroacetic acid in conversations with distributors and others. She also told distributors and family members that Syntrax was going to sell DIAC as a nutritional supplement to take the place of TRIAC as a metabolic regulator or a way to lose fat. *See* Exhibit E, at 19:20-25:13; 27:10-28:16.

(6) Prior use before Plaintiffs claimed invention was entirely probable. Indeed, the '533 Patent discloses studies, all dated no later than 1990, which showed the ability of DIAC to alter metabolic rate, at least in rats. Thus, use of DIAC for that purpose in humans was entirely foreseeable by the time Cornelius obtained DIAC from Tabak in late 2000 or early 2001.

(7) There is no evidence regarding the impact on the industry of the invention described in Claim 11 of the '533 Patent.

(8) Finally, as to the relationship between Cornelius and Ms. Nixon, it is, if anything hostile because she quit Syntrax because of a dispute with him. Nothing suggests that Ms. Nixon is biased in favor of Cornelius. *See* Exhibit E, at 19:8-12; 25:14-26:13.

Finally, Plaintiffs totally ignore the *In re Caveney* case discussed in Creative's Memorandum in Support of its Motion for Summary Judgment (*see* Dk. 53, at p. 8), under which Syntrax and its employees are themselves members of the public. Their use of DIAC was, therefore, a public use sufficient to invalidate Claim 11 of the '533 Patent.

16

Plaintiffs' complaint that Creative has not produced any contemporaneous documentary evidence to corroborate Cornelius' testimony because such materials normally exist rings hollow. Creative made the decision not to market DIAC. *See* Exhibit A, at 83:18-85:2. That decision was made sometime in 2001 because Cornelius discussed it with Brenda Nixon and she quit Syntrax on March 21, 2001. *Id.* Because Cornelius finally determined not to market DIAC, he would have had no need to apply for a patent on it. Furthermore, at a small company like Syntrax, it is hardly surprising that they would not have kept records documenting test results or public communications about a product they decided not to market. Indeed, it would be surprising if it had those types of records available for production more than 10 years after the fact, especially since Syntrax long ago ceased doing business. *See* Exhibit 2 attached hereto (deposition of Derek Cornelius), at 24:9-25:8. Creative was able to produce corroborating contemporaneous records of Cornelius' desire to obtain and use DIAC as a nutritional supplement (*see* Exhibits B and C, emails exchanges between Tabak and Cornelius).

By Plaintiffs' own admission, Cornelius and Syntrax had possession of DIAC no later than early 2001. The testimony of Brenda Nixon corroborates Cornelius' testimony that Syntrax publicly used DIAC and further made publicly known the use of DIAC as a dietary supplement, even going so far as to tell the public at large that Syntrax planned to use DIAC as a replacement for TRIAC as a metabolic regulator or a way to lose fat. Creative's Motion for Summary Judgment that Claim 11 of the '533 Patent is invalid under § 102(a) should be granted.

Dated:  June 12, 2013                 /s/ Thomas DeGroot
Thomas J. DeGroot (admitted *pro hac vice*)
LAW OFFICES OF THOMAS DEGROOT, LLC
7733 Forsyth Blvd.
Suite 1100
Saint Louis, MO 63105
314-296-6070
314-296-6001 (fax)
tom@degrootlaw.com

Maria Crimi Speth
Adam S. Kunz
Jaburg & Wilk, P.C.
3200 N. Central Ave., Suite 2000
Phoenix, AZ 85012

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2013, I electronically transmitted the foregoing to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following:

Gregory B. Collins (#023158)
Jenessa G. B. Coccaro (#027090)
KERCSMAR & FELTUS PLLC
6263 North Scottsdale Road, Suite 320
Scottsdale, Arizona 85250
Telephone: (480) 421-1001
Facsimile: (480) 421-1002
gbc@kflawaz.com
jbc@kflawaz.com
Counsel for Defendant

                                        /s/Debra Gower